Opinion filed August 22, 2013



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00106-CV
_____

**DELL, INC., Appellant**

**V.**

**WILLIAM WISE, JR., Appellee**

**On Appeal from the 250th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-09-001942**

## O P I N I O N

Because William Wise, Jr. believed that his age was a motivating factor when Dell, Inc. fired him, he sued Dell for wrongful termination. After a jury trial, the trial court entered a judgment upon the jury's verdict. The trial court in its judgment specified damages against Dell in the amount of $668,019, plus trial court attorneys' fees of $221,000 and appellate attorneys' fees up to a maximum of $25,000.

On appeal, Dell complains that there is no evidence to support the jury's finding that age was a motivating factor in Wise's termination, that the evidence is legally and factually insufficient to support the jury's findings on economic and compensatory damages, and that the trial court should not have submitted the issue of future or "front" pay to the jury. We affirm.

## I. *Background Facts*

Dell is an American multinational computer technology corporation. Dell develops, sells, and services personal computer systems (including laptops and desktops, monitors, printers, and other hardware); enterprise systems (including servers, network switches, data storage devices, routers, and bridges); software; peripherals; and other electronics. Wise was an eleven-year employee of Dell. He worked as a technical sales representative on three sales teams that supported three United States Air Force accounts that were part of the federal sales division.

### A. *Organization of Dell's Sales Teams and Divisions*

Dell's sales teams are composed of four people performing various functions. An account executive is Dell's face-to-face contact with the customer. The account executive travels, builds sales relationships, and—to use Dell's parlance—is "customer facing." A systems consultant travels with the account executive and provides technical support and assistance. The inside sales representative is an office employee who has less technical knowledge than a technical sales representative. The technical sales representative also works in the office and has more sophisticated knowledge of Dell's enterprise systems and supports the whole team. Inside sales representatives and technical sales representatives do not meet directly with customers in the field; they rely on the account executive's skills and the skills of the systems consultant as a part of the overall success of the team.

Typically, the effort to sell Dell's products begins when an account executive, a systems consultant, or an inside sales representative sends a customer's quote request to a technical sales representative. After a technical sales representative receives a customer quote request, he determines the products that are needed to meet the request; prepares and generates quotes related to the request; answers technical questions; follows up on quotes; and generally interacts with the account executive, systems consultant, and inside sales representative in an effort to obtain a purchase order from the proposed customer. If the customer accepts the quote, the inside sales representative enters the purchase order, and the order is placed in production. After the process is complete and after the customer has paid for the order, the team members who worked on the sale, including the technical sales representative, receive credit for the sale.

Dell had several sales divisions that operated under that format. Three of those divisions were the educational sales division, the health care sales division, and the federal sales division. Kelly Wilhelm worked for Dell as a regional inside sales manager and, as such, was the leader of each of those three divisions. There were two groups within the federal sales division that Wilhelm supervised. One of those groups consisted of Wise and sixteen other technical sales representatives. Andrew Napora, a technical service representative manager, actually managed that group under Wilhelm's direction. There were four technical sales representatives in the other group in the federal division, and this group reported directly to Wilhelm.

Wilhelm oversaw five Air Force accounts in Dell's federal division. Wise supported three of those five accounts; another technical sales representative, Nick Kelley, supported the other two accounts. Each of the three Air Force sales teams with which Wise worked in the federal sales division consisted of an account executive, a systems consultant, an inside sales representative, and himself.

## B. Technical Sales Representatives' Performance and Evaluations

Dell had adopted a method by which it gauged performance of its sales teams, including technical sales representatives like Wise. Dell's finance department personnel used two-year historical sales data to arrive at a sales quota for various teams. Dell personnel then determined whether a team met that sales quota and by what margin. That review comprised 66% of the total performance review. The remainder of this segment of the evaluation of a technical sales representative involved customer interaction, teamwork, communication, implementation of strategic initiatives, and other skills.

Dell personnel tracked a technical sales representative's performance based 60% on core enterprise product sold, 20% on the profit margin generated, and 20% on the amount of peripherals involved in a particular sale. By the use of those figures, Dell personnel arrived at an average blended quota attainment. Technical sales representatives were rated "exceptional," "valued," or "below," in part, based on the number of quarters that they attained their quotas and exceeded blended attainment goals, as well as other factors. On the other hand, their annual performance reviews focused on the complete picture of quotas, attainments, and other factors.

There are a number of reasons why technical sales representatives might miss their sales quotas. Economic conditions, including military spending cycles, could differ from Dell's projections and negatively affect sales. Reduced end-of-fiscal-year government spending for military appropriations would adversely affect sales in Dell's fourth quarter (November to January) because military budgets would be depleted. Further, having new members on the team can make it "more challenging" for a team to make sales and for technical sales representatives to meet their quotas. Napora testified that the two-year historical data that Dell used to set quotas could be incorrect, that the quotas could be set too high for sales

teams to meet those unrealistic quotas, and that that would not be the fault of the sales team or its technical sales representative.

Napora agreed that a "group effort" is required for technical sales representatives to meet their quotas. Napora testified that, when he was employed as a technical sales representative for approximately twenty-nine months, he had not always met his sales quotas. Napora acknowledged that there are factors that are beyond one's control that will affect adversely one's ability to meet quotas and that a failure to meet a quota does not automatically mean that technical sales representatives are not doing their jobs.

Should technical sales representatives need to improve their performance, Dell developed a procedure, operated through its human resources department, to assist them. A technical service representative manager, like Napora, or a regional inside sales manager, like Wilhelm, could, within certain guidelines, initiate a Performance Improvement Plan. The plan was to be considered and used with discretion in cases where the technical sales representative had (1) quarterly blends below 90% for two or more consecutive quarters, (2) overall inconsistent attainment: a history of hit and miss on quotas, (3) consistently missed strategic initiatives, and (4) consistent quality issues (customer complaints). Dell's goal was to improve performance and foster a winning culture that increased sales.

Managers were to follow Dell guidelines and procedures in using Performance Improvement Plans. First, managers were required to consider quota-setting issues, external business conditions, backlog, and other reasons determined by those in sales leadership before requiring that someone participate in a Performance Improvement Plan. Second, Dell required that the department of human resources validate all facts used to support the Performance Improvement Plan and attend the Performance Improvement Plan meeting as a neutral party to answer questions. This validation requirement was designed to confirm "whether

5

or not it would be appropriate to place the employee on a PIP." Third, Performance Improvement Plans had to be documented and delivered to an employee within one week of the quarterly Performance Improvement Plan meeting. Fourth, managers were to meet weekly with the employee and provide written feedback on the employee's Performance Improvement Plan progress. Fifth, Dell's own policies and procedures required that technical sales representatives operating under a Performance Improvement Plan should be allowed at least one full quarter in which to show improvement. Finally, general managers, sales leaders, and human resources personnel were to review and approve Performance Improvement Plans.

### C. Wise's Performance and Evaluations Compared to Other TSRs

Wise received a quota that was a "roll up" of the enterprise quota assigned to his three teams. In 2007,[1] Wise met or exceeded his sales quotas in two quarters, and he had a blended attainment of 136.62%. Wise's performance record included an August 2006 customer e-mail in which the customer praised his performance. Wise's manager, Napora, wrote, "Bill has had an excellent year, he has delivered on the required numbers, he won a Circle of Excellence award and helped deliver a $10m deal to the Federal organization." Napora testified that Wise "did well" and did not have any customer satisfaction or quality-of-work issues. For 2008, Napora recommended that Wise voice his opinions and focus more on leadership skills. A few months later, Phyllis Pate, a Dell employee, wrote to Napora that Wise stepped up to help when a team member was out and the team was shorthanded. Shortly thereafter, Wilhelm wrote in an e-mail that Bill had done awesome work and concurred that Wise "was a good TSR."

---

[1]Dell has a fiscal year that starts in February but is numbered a year ahead of the actual calendar year. Fiscal Year 2007 would have begun in February 2006 and concluded in January 2007.

Although Wise always wanted to help his teams meet their quotas, it was not always possible. Napora testified that technical sales representatives did not always have control over their sales teams and whether they met their quotas. Managers were the ones who assigned team members and accounts, and Napora said that a new team member may not make his or her sales quota and that that would affect the technical sales representative's numbers as well. In 2008, Dell added six new members to Wise's teams.

Napora testified that the federal sales teams were "challenged" because the Air Force customers were simply not buying what Dell had forecast. Wise confirmed the existence of sales difficulties, stating that "everybody was having a hard time selling at that point in time" and that high turnover had made it difficult to meet his quota. Napora admitted that he could not recall another time when so many technical sales representatives failed to make 100% of their quotas; that, in setting the quotas, the financial department is sometimes wrong; and that sometimes the failure to meet the quota is outside the employee's control.

Napora completed Wise's annual performance evaluation for 2008 and gave him a rating of "below." Wise had $40 million in sales and $10 million in profit in 2008. Wise's blended attainment was 88.28%: his best quarter was 92%, while the worst was 82%. Wise achieved these figures despite having two new account executives, two new systems consultants, and two new inside sales representatives join his account set. Napora rated him "below" because Wise did not attain more than 90% average blended attainment and did not have at least one quarter at 90% or better. But Napora did not mention new team members, unrealistic quotas, slow sales, and turnover issues when he evaluated Wise in 2008. Further, in his evaluation, Napora did not mention the recent praise Wise received from customers and Dell employees. Because of the "below" rating, Napora put Wise on a Performance Action Plan in January 2008.

*D. Dell's Disciplinary Action Against Wise*

Because he and his teams actually exceeded their quarterly monetary goals for enterprise products, Wise disagreed with Napora's conclusion that Wise had not met his quota in the first quarter of 2008. Napora acknowledged that, in the first quarter of 2008, Wise's actual sales numbers for his "revenue attainment" were over $8 million—110.73% of the quota—with more than $1.9 million in profit—102% of the quota. But Napora said that Wise fell short on his "software and peripherals" component, which lowered the overall average to 88.85%. However, Napora refused to provide Wise with data to verify this claim and failed to list "software and peripherals" numbers on Wise's Performance Action Plan. Nevertheless, the evidence shows that Dell placed a requirement in Wise's Performance Action Plan that Wise was to sell an additional $2.2 million in the fourth quarter of 2008 in order to achieve over 100% of his quarterly quota.

When Wise did not meet the Performance Action Plan quota, Napora put Wise on a Performance Improvement Plan in March 2008. Napora also noted that Wise had missed two quarters in 2007 and four in 2008 and that those facts supported his decision to put Wise on a Performance Improvement Plan. Napora failed to note that Wise had the highest technical sales representative quota average in 2007. In addition, Napora managed sixteen other technical sales representatives: six of them failed to attain their quotas, two had unknown values, and five had worse numbers than Wise. But Wise was the only technical sales representative whom Dell placed on a Performance Action and a Performance Improvement Plan.

In Wise's Performance Improvement Plan, Dell required improvement in six areas in seven weeks:

1. Attain his midpoint core enterprise revenue number;

2. Carry two and one-half times his left-to-sell quota in pipeline at all times in the quarter and one time in weighted;

3. Follow up his ten largest quotes from the previous week and document in sales force;

4. Convert two acquisition customers in the quarter;

5. Grade out at 75 or better on the score card for Q1 and Q2;

6. Meet with Napora biweekly (twice a month) to review progress on attainment and "how's."

Napora testified that the midpoint core enterprise revenue number is not a definite figure because the company reports to Wall Street on a quarterly basis but had moved to a semiannual plan. Wise testified that he thought he was close to meeting the second requirement because he had developed almost $84 million worth of business in his pipeline and expected $62 million of that to come through. Wise said that, once "everybody got used to their account sets and we started working as a team," they would have "kept the ball rolling" and "we would have done okay. . . . [I]t was just a matter of time."

Wise also said that he followed up on quotes and worked with his team members on closing those deals. But as a technical sales representative, Wise was not in the field and could only use the telephone and e-mail to develop business. More importantly, Dell had an acquisition team for this purpose, and account executives and systems consultants were extremely protective of the leads they developed. Napora admitted that it took a team effort of inside and outside members to convert a customer and that he did not require his other technical

sales representatives to "actually convert" any customers; he "just wanted them to try." Finally, Wise and Napora scheduled the meeting dates as required in the Performance Improvement Plan, but those meetings and follow-up did not occur. Wise did not meet the sales quotas and other requirements in the Performance Improvement Plan.

*E. Dell's Termination of Wise*

Dell maintains that Napora and Wilhelm, each of whom was thirty-four years old, fired the 61-year-old Wise for poor performance in meeting the Performance Action Plan and Performance Improvement Plan requirements. After Wise was fired, Kelley took over his accounts. Dell's Involuntary Termination Summary contained a statement that Dell fired Wise for failure to improve performance under the Performance Action Plan and the Performance Improvement Plan.

The record also shows that Wise was the oldest technical sales representative who worked under Wilhelm's supervision. The average age was thirty-seven. Wise was a certified network engineer and a Dell file-server support technician with a strong technical acumen and specialized knowledge of Dell's products. Wise, a United States Navy veteran and an eleven-year Dell employee with extensive computer industry experience and training, received praise for his work from coworkers and supervisors. Dell named Wise "TSR of the Quarter" in 2003 and 2006.

In 2006 and 2007, Dell awarded Wise its annual "Circle of Excellence" award. Wise attained 136% of his annual goal in 2007, higher than any other technical sales representative in his group.[2] As part of the Circle of Excellence

---

[2]The "ESL/HCLS/FED" Group had 100 employees spread over its seven divisions.

awards, Dell sent Wise and his wife, Vicki, to Puerto Rico and Cabo San Lucas.[3] Dell fired Wise twelve months after Dell awarded him the second Circle of Excellence trip.

### F. Wise's Economic and Compensatory Damages

Dr. Thomas Glass, a certified public accountant with a doctorate in economics, testified as an expert witness on Wise's economic damages. Wise and Vicki testified at trial on the issue of his compensatory damages. Dr. Glass testified that back pay for fiscal years 2008–2010 totaled $249,911, and that front pay for fiscal years 2010–2014 totaled $408,708. He did not deduct any post-termination earnings because there were none. Wise and Vicki testified about the psychological, physical, social, economic, and emotional toll he suffered because of Dell's conduct.

Wise testified that Dell fired him after he had returned from vacation, the week of his daughter's wedding, and that he could not believe Dell had treated him this way; he felt "really bad" and was worried. Wise also testified that he had suffered from stress and depression as well as loss of sleep and any desire to participate in family or recreational activities. Wise said that he had not planned to retire and that he worried constantly about how he would provide for his family without salary, benefits, or job prospects. Vicki testified that, when Dell fired Wise, it had a severe physical and emotional toll on him. She further testified that she had to "walk on eggshells" because Wise did not want to do any family activities, paced in his study late at night, and often cried when the issue of Dell's firing him was discussed.

### II. *Issues Presented*

Dell complains in its first issue that there was no evidence upon which the jury could find that age was a motivating factor in Wise's termination because

---

[3]Other Circle of Excellence winners also went on these two trips.

there was no direct evidence of age discrimination. Dell maintains that they terminated Wise because he failed to meet sales quotas. Dell further argues that Wise presented no evidence that he was treated differently from other sales personnel outside his protected class or that he was replaced by a younger employee. In addition, Dell argues that the evidence established that Wise was treated more favorably than required by Dell policy. Dell maintains in its second issue that the evidence is legally and factually insufficient to support the jury's award of damages awarded for back and front pay and that the finding cannot be supported by the testimony of Wise's expert, Dr. Glass. Dell also argues that the award of damages for mental anguish is not supported by Wise's and Vicki's testimony. Dell's final issue is that the trial court erred when it submitted the front-pay issue to the jury.

### III. *Standard of Review*

When we conduct a legal sufficiency review, we review the evidence in a light that tends to support the disputed finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). We "assess all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in favor of the judgment." *City of Austin Police Dep't v. Brown*, 96 S.W.3d 588, 593 (Tex. App.—Austin 2002, pet. dism'd) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). If more than a scintilla of evidence supports the challenged finding, the no-evidence challenge must fail. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).

For a factual sufficiency review, we examine all the evidence in the record, both for and against the lower court's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We must consider and weigh all such evidence in a neutral light.

12

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). But "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (footnotes omitted). If the evidence at trial would enable reasonable minds to differ in their conclusions, we do not substitute our judgment, so long as the evidence falls within a zone of reasonable disagreement. *Id.* at 822. In considering and weighing all of the evidence, we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 35 (Tex. App.—Austin 1998, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

IV. *Discussion and Analysis*

Dell argues that there was no evidence to support the jury's conclusion that age discrimination was a "motivating factor" in Wise's termination. We disagree.

Texas courts recognize two methods of proof in discriminatory treatment cases. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012) (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001)). The first is proof by direct evidence; the second is proof by indirect or pretext evidence. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Direct evidence, if believed, proves the fact of discriminatory animus without inference or presumption. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). But proof through direct evidence is difficult. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (seldom is there an eyewitness to employer's mental processes evincing discriminatory intent); *see also Mission Consol.*, 372 S.W.3d at 634 (covert motives make direct forbidden animus "hard to come by"). When there is no direct evidence, discrimination can

be proven indirectly by the "pretext" method. *See McDonnell Douglas*, 411 U.S. at 802–05.

When a case has not been fully tried on the merits, we apply the burden-shifting analysis established by the United States Supreme Court. *Canchola*, 121 S.W.3d at 739 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). When a case has been fully tried on the merits, as in this case, we do not engage in the burden-shifting analysis but, instead, determine whether the evidence is legally sufficient to support the jury's ultimate finding. *Id.* At trial, Wise had the burden to prove that his age was a motivating factor in Dell's decision to terminate him. *Id.*

### A. Sufficiency of Evidence of "Age as Motivating Factor in Wise's Termination"

Dell argues that the evidence is insufficient to establish pretext through a showing of disparate treatment. Dell contends that there is no similarly situated employee for comparison because no one else missed six consecutive quotas. Wise contends that there were similarly situated employees because Wise would not have missed as many quotas if Napora had properly considered whether the quota was reasonable.

### 1. Similarly Situated Employees

"Similarly situated" means that the employees' circumstances were comparable in all material respects, including similar standards, supervisors, and conduct. *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). To prove discrimination based on disparate discipline, the misconduct of both disciplined and undisciplined employees "must be of 'comparable seriousness.'" *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008) (quoting *Monarrez*, 177 S.W.3d at 917).

14

Napora testified at trial that he placed Wise on a Performance Improvement Plan because Wise had not "hit his quota more than two times in the last eight quarters." The last eight quarters included the four quarters in 2007 and the four quarters in 2008. Wise was the highest performing technical sales representative in all of 2007. In fact, because of those numbers in 2007, Wise was given the Circle of Excellence Award and an "all-expense-paid" vacation. Napora testified that Wise's numbers in 2007 were "really good" and agreed that his numbers that year were "not something to be counted against him." However, Wise could not miss six consecutive quotas unless Napora included part of 2007 in his calculation. Moreover, when Napora placed Wise on a Performance Improvement Plan for the fourth quarter of 2008, he required Wise to sell an additional $2.2 million in order to reach his quota. The jury could have concluded that this contributed to the reason that Wise missed his quota that quarter.

Before requiring a Performance Improvement Plan, Dell's internal policies require managers to consider "quota setting issues, external business conditions, backlog and other reasons determined by sales leadership." When conducting annual reviews, the managers are to consider the number of quarters that an employee missed his quota as well as the average blended quota attainment for the year. Dell's analysts used historical sales data for the prior two years to arrive at the quota.

Trial testimony showed that the Air Force must spend the remainder of its budget at the end of the year or else risk losing that amount from its budget during the following year. The fourth quarter of the federal government's fiscal year is the third quarter of Dell's fiscal year; the Air Force traditionally spends more of its budget during Dell's third quarter. For example, in 2007, Wise's sales percentages were 69.81% in the first quarter, 159.16% in the second quarter, 247.41% in the third quarter, and 70.09% in the fourth quarter.

15

Although Wise did not reach 100% during two quarters in 2007, he still had the highest percentage, at 136.62%, of any other technical sales representative, including four technical sales representatives who had only missed one quarterly quota. And, if the jury concluded that Wise would not have missed his fourth-quarter quota each year had it been properly adjusted, Wise would have only missed five of his last ten quarters at Dell. During that same period, another technical sales representative missed five of those ten quarters, while yet another missed six.[4] This is some evidence that would allow the jury to conclude that, if Wise's quota had been adjusted to conform to the spending habits of the Air Force, he may not have missed six consecutive quarters.

In conducting annual reviews, supervisors first rate the employee's performance based on the number of quarters that quota was attained. An employee received a rating of exceptional, valued, or below expectation, depending on the frequency that the quarterly quota was missed. Attainment of less than 100% constitutes a "missed" quota. If the employee attains one out of four, he rates "below average." Two out of four quotas rates as "valued," and four out of four rates as "exceptional." Then the supervisor must rate performance based on average blended attainment. The employee would receive another rating of exceptional, valued, or below expectation, depending on the percentage of attainment. Attaining more than 105% warrants an exceptional rating, earning between 90% and 105% warrants a valued rating, and earning below 90% warrants a rating of below expectation.

Even though Wise missed two out of four quarters in 2007, he nonetheless had the highest average blended attainment for the year. The same is true in 2006. Although Wise was the only technical sales representative who missed all four quarters in 2008, he did not have the lowest annual blended attainment for the year.

_____

[4]Scott Hargrove missed five out of ten. Jason Lozada missed six out of ten.

16

This is some evidence that Napora failed to consider, in accordance with Dell's internal policies, whether the quota was realistic or whether Wise's failure should be excused in light of factors outside his control. Therefore, the jury could have concluded that "missed quarters" were not the benchmark for determining whether other employees were similarly situated.

### 2. Disparate Treatment

Dell contends that, to establish pretext, there must be evidence of a nexus between the failure to follow procedures and the decision to terminate the employee. Dell further contends that any failure to follow internal policies amounted to mere sloppiness because there was no evidence that "the policies were not followed *due* to Wise's age." However, when establishing that Dell's reason for terminating Wise was pretext, a plaintiff is not required to provide direct evidence that the failure was "due to" age. A plaintiff can show that the employer followed policies in a similar situation and failed to here, or vice versa. *See Toennies*, 47 S.W.3d 473. The question is whether the failure to follow policies indicates that the reason for terminating the employee was a pretext for discriminatory intent. *See McDonnell Douglas*, 411 U.S. at 802.

The evidence shows that there were undisciplined employees with similar numbers as Wise. Catherine Sims and David Kell both missed three consecutive quarterly quotas, but they were never disciplined. Jason Lozada's attainment was inconsistent; he missed his quota in the first quarter of 2009, two quarters in 2008, and two quarters in 2007. Although Kell missed his quota during three out of four quarters in 2007 and had an annual blended attainment of 78.05%, he received a valued rating. Yet, when Wise missed his quota in four quarters the following year, with a higher annual blended attainment of 88.28%, he was rated below expectations. Scott Hargrove also missed his quota during three of the quarters in

2008, but Napora testified that Wise was the only employee that he had ever disciplined or fired.

In addition, evidence that an employer is pleased with an employee's work performance supports a finding of pretext when that evidence contradicts the reason given by the employer of poor performance. In *Toennies*, the supreme court reached such a conclusion based on the testimony of a senior project manager that the employee was diligent, very competent, and an above-average engineer and that he rated the employee's knowledge of the profession as a ten on a scale of one to ten. 47 S.W.3d at 481. Additionally, several e-mails from coworkers were admitted at trial that praised the employee's performance. *Id.*

Here, e-mails from Wise's coworkers and supervisors praised his effort and performance during the alleged period of poor performance. Wise was the highest performing technical sales representative in 2006 and 2007 and was given the Circle of Excellence award both years. When conducting Wise's annual review in 2007, Napora praised Wise as having had "an excellent year," and the only areas Napora identified for development were "demonstrating more leadership" and the "acquisition of new business." Napora also noted in his 2007 review that Wise had won the "Circle of Excellence Award and helped deliver a $10 [million] deal to the Federal organization." Furthermore, Napora admitted that Wise had no customer service or quality issues, and Wilhelm said that Wise had shown "[a]wesome work" and "leadership" and was a "good TSR." But, when Napora was asked to name the worst technical sales representative that he ever managed, Napora said, "Mr. Bill Wise." This is more than a scintilla of evidence that Dell regarded Wise's job performance as satisfactory, which contradicts the company's argument that he was fired for poor performance. "Proving the employer's stated reason for the firing is pretext is ordinarily sufficient to permit the trier of fact to find that the employer was actually motivated by discrimination." *Id.* at 481–82.

18

The evidence is sufficient to support the conclusion that Dell treated Wise differently than its younger, similarly situated employees. Moreover, there is some evidence that Dell regarded Wise's performance as satisfactory during the period of Wise's alleged poor performance. Consequently, we hold that a rational jury could have inferred that age was a motivating factor in Dell's decision to fire Wise. We overrule Dell's first issue.

*B. Sufficiency of Evidence on Wise's Economic Damages*

Dell argues that the evidence is legally and factually insufficient to award Wise economic damages because the opinion of his expert witness on the issue is unreliable and inadmissible. Dell argues that the expert ignored key facts, that he assumed facts directly contrary to known facts when he formulated his opinions, and that he made impermissible assumptions concerning Dell's compensation systems, including annual wage increases, Wise's length of future employment, Wise's projected 401(k) contributions, and Wise's future sales performance.

We review the trial court's decision to admit expert testimony for an abuse of discretion. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995) (abuse of discretion standard on expert testimony).

*1. Expert Witness Qualification*

Rule 702 of the Texas Rules of Evidence requires that an expert must be properly qualified and that his opinion must be relevant and based upon a reliable foundation.[5] Trial courts must determine that the expert witness truly has scientific, technical, or other specialized knowledge or expertise concerning the

---

[5]*See* TEX. R. EVID. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) (expert testimony on scientific knowledge must be helpful to factfinder and valid and reliable scientific testimony); *Gammill*, 972 S.W.2d at 719–28 (expert must be qualified and reliability standard applies to all expert testimony); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995) (expert witness must be qualified and provide reliable opinions).

actual subject matter about which he is offering an opinion. *Gammill*, 972 S.W.2d at 719. Once qualified, an expert must give relevant and reliable opinions. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Relevance under Rule 702 of the Texas Rules of Evidence requires that expert testimony be sufficiently tied to the facts of the case and that it assist the jury in resolving a factual dispute. *Id.*

Reliability requires a sound foundation for nonscientific evidence, and trial courts must decide whether there is an "analytical gap" between an expert's opinions and the basis for them. *Gammill*, 972 S.W.2d at 726 (focusing on experience and knowledge in field for reliability inquiry for nonscientific evidence); *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 619 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (focusing on expert's experience, education, and literature review in field for reliability analysis of opinion); *see also Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (reliability focuses on principles, research, and methodology underlying an expert's conclusions). We do not determine if the expert's opinions are correct but, instead, determine only whether the analysis used to reach those opinions is reliable. *Zwahr*, 88 S.W.3d at 629 (citing *Gammill*, 972 S.W.2d at 728).

### 2. Testimony of Wise's Expert Witness, Dr. Glass

Wise called Dr. Glass to testify as an expert on economic damages. Dr. Glass, a 45-year certified public accountant with a bachelor of arts in business administration, a master's degree in public accounting, and a doctorate in economics from the University of Texas at Austin, testified at trial on the issues of front-pay and back-pay damages. Dr. Glass's CPA practice employs twenty people who provide clients with business advice, entity creation and accounting support, tax preparation, and audit services. Dr. Glass has worked on more than 300 cases, including personal injury, lost profits, lost compensation, and wrongful

termination cases. He has prepared reports in approximately thirty to forty cases that included a dozen or more lost compensation reports, and he has testified, in deposition or at trial, in more than sixty cases.

Dr. Glass testified that, in this case, he reviewed Wise's age, education, work history, earnings history, life expectancy, employment benefits, income tax returns, and applicable rates as well as Social Security Administration wage increase projections and discount rates from five-year Treasury obligations to arrive at his opinion. Dr. Glass combined Wise's annual gross pay from 2003 to 2007 and calculated an average of $107,546, to which he added the cost of health insurance and a 3% 401(k) match by Dell. Dr. Glass thought it appropriate to include the 401(k) contribution because Wise had made those contributions in the past, and Wise testified that he would have continued to do so in the future.

Dr. Glass used a five-year period instead of the two highest years of 2005 and 2006 because he believed that the format was a more reliable standard than speculating on a future plan or using only the highest salary years. Dr. Glass viewed the latter as inequitable because it "really skewed the average upwards." Dr. Glass said, "History, I think, is a better measure than -- than the many unknown factors that you have that you're trying to use this sales plan to figure out what his future compensation is gonna be." Dr. Glass stated that, in his experience and training, Wise's compensation would have been stable and comparable to the average he calculated. Napora testified that all technical sales representatives receive standard benefits like health, dental, vision, and 401(k) retirement accounts and that his own salary had never decreased in his thirteen years at Dell.

Dr. Glass increased gross pay each year by a projected 3.9%, using the Social Security Administration rate for long-term wage increase, which he relies on in almost every case. He set July 2014 as Wise's expected retirement date, based on standard work-life expectancy tables and Wise's testimony that he would

have worked until after his son finished college. Dr. Glass deducted income tax (using an average tax rate of 13.2%) from projected annual salary and reduced the figure to present value using a 1.8% discount rate.

Dr. Glass used the above method to determine both "front pay" and "back pay." Front pay is lost compensation from trial forward until a reasonable retirement age, which also is a fact question for the jury. *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d 1461, 1469 (5th Cir.1989); *Davis*, 979 S.W.2d at 45 (citing *Hansard*, 865 F.2d at 1469); *Borg-Warner Protective Servs. Corp. v. Flores*, 955 S.W.2d 861, 867 (Tex. App.—Corpus Christi 1997, no pet.); *City of Austin v. Gifford*, 824 S.W.2d 735, 743–44 (Tex. App.—Austin 1992, no writ). The amount of Wise's loss (front pay and back pay) must be shown by competent evidence with reasonable certainty. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "Back pay" is defined as those lost wages that accrue from the date of termination through trial. *United Servs. Auto. Ass'n v. Brite*, 215 S.W.3d 400, 401 (Tex. 2007); *Stanley Stores, Inc. v. Chavana*, 909 S.W.2d 554, 563 (Tex. App.—Corpus Christi 1995, writ denied).

Front-pay calculations are inherently speculative because of their prospective nature and are arrived at through intelligent guesswork. *See Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 223 (5th Cir. 2011); *W. Telemarketing Corp. Outbound v. McClure*, 225 S.W.3d 658, 667 (Tex. App.—El Paso 2006, pet. granted, judgm't vacated w.r.m.). A trial court is afforded wide latitude in determining front-pay issues. *Sellers v. Delgado Coll.*, 781 F.2d 503, 505 (5th Cir. 1986). We will uphold a jury award where there is some evidence that a substantial loss occurred and there is "a reasonable basis for estimating the amount of the loss." *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 695 (Tex. App.—Austin 1989, no writ); *see also Tex. Dep't of Pub. Safety v. Williams*, No. 03-08-00466-CV, 2010 WL 797145, at *7 n.13 (Tex. App.—Austin Feb. 19, 2010, no

22

pet.) (mem. op.). Absent evidence to the contrary, it should be assumed that an illegally discharged employee would have continued working for the employer until retirement. *See Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 n.8 (8th Cir. 1982).

Based upon the method that he outlined, Dr. Glass testified that back pay for fiscal years 2008–2010 totaled $249,911 and that front pay for fiscal years 2010–2014 totaled $408,708. He did not deduct any post-termination earnings because there were none.

We hold that Dr. Glass articulated a reliable and well-accepted method for evaluating back pay and front pay. *Williams*, 2010 WL 797145, at *7 n.13, *10 (reliable expert opinion for calculating back pay and front pay based on analysis of payroll records); *Taylor*, 132 S.W.3d at 622 n.23 (reliable expert calculation of future compensation based on past earnings and use of government statistics and life expectancy tables, discounted for present value).

In *Williams*, the Third Court of Appeals affirmed jury awards of back pay and front pay based on expert opinions evaluating past payroll records. *Williams*, 2010 WL 797145, at *7 n.13, *10. The Eighth Court of Appeals reached a similar conclusion that front-pay award was calculable by averaging plaintiff's past earnings even though hours worked, incentives, premiums, and tenure pay varied. *W. Telemarketing*, 225 S.W.3d at 667–68. Other courts have upheld similar awards. *Osborn v. Computer Sci. Corp.*, No. A-04-CA-158-LY, 2005 WL 5881949, at *3–4 (W.D. Tex. Oct. 20, 2005) (order) (expert's calculation of saleswoman's pay and past commissions discounted for present value was reliable); *Taylor*, 132 S.W.3d at 622 n.23 (expert calculation of future compensation based on past earnings in combination with government statistics and life expectancy tables, discounted for present value was reliable). In *Little v. Technical Specialty Products, LLC*, No. 4:11-CV-00717, 2013 WL 1628390, at *5

23

(E.D. Tex. Apr. 15, 2013), an expert's methodology was reliable because the expert used pay stubs and timesheets to calculate weekly pay, used the average weekly pay for the weeks lost after discharge, and adjusted the amounts for life expectancy. Although prospective in nature, which involves some uncertainty, Dr. Glass's opinions provided "a reasonable expectation" of what Wise would have earned, had he not been fired, using a well-accepted valuation method.

### 3. Wise's Compensatory "Mental Anguish" Damages

Dell has challenged the "mental anguish" element of the jury's award of compensatory damages, claiming that Wise's and Vicki's testimony is no evidence under *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex. 1995). Dell did not object to the submission of Jury Question Number Three, element "c," a broad-form submission that read "Compensatory damages in the past" and included "pain and suffering, mental anguish, inconvenience and loss [of] enjoyment of life" followed by the word "Answer" with a corresponding blank for the jury to enter an amount. Dell has not challenged the other elements: "pain and suffering, inconvenience and loss [of] enjoyment of life." We are prohibited from reviewing a no-evidence issue on only one element of a multielement damage submission; we will affirm the damage award in a broad-form submission if any one element is supported by the evidence. *Thomas v. Oldham*, 895 S.W.2d 352, 359–60 (Tex. 1995). Therefore, we reject Dell's legal sufficiency challenge, but will review the aggregate compensatory damages evidence for sufficiency.

A plaintiff must have evidence of the nature, duration and severity of the mental anguish and evidentiary support for the amount of damages. *Bentley v. Bunton*, 94 S.W.3d 561, 605–07 (Tex. 2002); *Parkway*, 901 S.W.2d at 444–45. In *Parkway*, there was no evidence of the nature, duration, or severity of the plaintiff's mental anguish and no circumstantial evidence of the incident that allegedly caused it. *Parkway*, 901 S.W.2d at 444–45. In *Bentley*, the court held

24

that there was no evidence to support an award of $7 million for mental anguish damages, which was forty times more than the amount of damages awarded for damages to reputation. *Bentley*, 94 S.W.3d at 605–07.

Wise's evidentiary proof is more substantial than that in *Parkway* and exceeds the proof held legally sufficient in *Quinn v. Nafta Traders, Inc.*, 360 S.W.3d 713, 724 (Tex. App.—Dallas 2012, pet. denied). In *Quinn*, the court held that sufficient evidence was presented on compensable mental anguish when plaintiff described that (1) her termination weighed heavily on her mind; (2) she had tremendous anxiety and was depressed; (3) she had trouble sleeping; and (4) she took medicine for her symptoms, which lasted for about six months. 360 S.W.3d at 724.

The jury heard Wise testify that he "felt really bad" when Dell fired him after eleven years of service and that it had an immediate emotional toll on him and his family because, among other things, it happened the same week as his daughter's wedding. Wise said that he was in shock and could not believe that Dell would not let him get his personal items from his desk. Wise had not planned to retire and wanted to work until his son finished college. He applied for jobs, but worried Dell's "poor performer" label hurt him. He had no job offers, except for a joint venture opportunity with no pay, and this circumstance added to his stress, anxiety, and depression. As a result, Wise said that he worried daily about how he could fulfill "his purpose in life": to provide for his family.

Wise and Vicki also testified that the stress to find a job and take care of finances and health care expenses adversely affected his sleep, appetite, health, relationships, moods, and activities. Wise testified that he lost sleep, suffered from depression and took medication, lost forty-four pounds, and frequently got angry and lost his temper when talking to Vicki. Vicki explained that it was like walking on "eggshells"; that, although uncommon before Dell fired him, Wise paced his

25

study at night and could not sleep; and that the subject of his firing often led him to tears. He had once been a loving and caring family man, but now had no interest in doing anything. Wise also testified that he had stopped playing in his band after being a part of it for more than thirty-two years. The jury heard sufficient evidence of the nature, duration, and severity of Wise's mental anguish.

The amount awarded, $44,400 for past compensatory damages, which included mental anguish as one element in a multielement broad-form submission, and zero for future compensatory damages, was reasonable in light of Wise's testimony that he had applied for more than sixty jobs but still remained unemployed and Wise's and Vicki's testimony detailing his health problems. The amount that the jury awarded to Wise was modest and not at all like the unreasonable amount in *Bentley*. *94* S.W.3d at 605–07. We overrule Dell's second issue.

### C. Submission of Front Pay to Jury

Dell objected to the trial court's submission of the front-pay question to the jury because it argued that only the trial court can award front pay. Although the trial court must decide whether it is equitable for Wise to recover front pay, the jury may determine the amount. *Davis*, 979 S.W.2d at 45 (citing *Hansard*, 865 F.2d at 1470); *see also Jackson*, 426 F. App'x at 221 (trial court has discretion to determine if front pay is warranted and submit that fact question to jury); *Williams*, 2010 WL 797145, at *8–10 (affirming jury's award of front pay). To recover front pay, a plaintiff must show that reinstatement is not feasible as a remedy and must also show mitigation of damages. *Davis*, 979 S.W.2d at 45 (citing *Hansard*, 865 F.2d at 1469). Dell stipulated at trial that it would not reinstate Wise. As we previously explained, Dr. Glass's testimony was admissible because it was relevant and reliable; thus, the trial court properly submitted the front-pay question to the

jury. The jury heard sufficient evidence of Dr. Glass's front-pay calculations and Wise's attempt to find comparable employment. We overrule Dell's final issue.

## V. *Conclusion*

We have considered the evidence in the light most favorable to the verdict, and we hold that there is more than a scintilla of evidence to support a jury finding that age was a motivating factor in Wise's termination where (1) other technical sales representatives, who had missed sales quotas, were neither disciplined nor fired and (2) Dell failed to follow its own procedures for evaluating and disciplining Wise. Further, we have considered all of the evidence in a neutral light, and we hold that the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust because reasonable and rational jurors could have believed Dr. Glass's, Wise's, and Vicki's testimony. Because damages were disputed, we defer to the jury's credibility determinations, which were not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Finally, the trial court properly submitted the front-pay question to the jury because Dell stipulated that Wise's reinstatement was not feasible.

## VI. *This Court's Ruling*

We affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE


August 22, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

27