

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00489-CV

BELL HELICOPTER TEXTRON, INC.                                   APPELLANT

V.

BRIAN BURNETT                                                   APPELLEE

----------

## FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 153-276130-14

----------

## OPINION

----------

The trial court awarded appellee Brian Burnett damages for age discrimination after appellant Bell Helicopter Textron, Inc. fired him when he was forty years old. In six issues, Bell Helicopter contends that the evidence is legally and factually insufficient to support several findings on liability; that the trial court abused its discretion by awarding Burnett front pay; and that, alternatively, the labor code caps Burnett's damages for front pay and for future mental anguish.

We hold that the evidence, although conflicting in some respects, supports the trial court's findings on liability and on damages; we decline to second-guess those findings based on our review of the cold appellate record. We also conclude that the labor code does not cap the trial court's awards for front pay and for future mental anguish. We therefore affirm the trial court's judgment.

## Background

Burnett was born in August 1973. He was twenty-two years old in 1996 when he began working for Bell Helicopter—a rotor aircraft business—as a stock clerk. The stock clerk position required him to pull parts for customers and to process bills of lading. He worked as a stock clerk for three years before he became a dispatcher at Bell Helicopter for two years. As a dispatcher, he was responsible for ensuring that parts reached assemblers on time.

Burnett later worked in Bell Helicopter's data release department, performing clerical work. His main function was to load engineering orders and drawings into a computer system. After working in that department for nine years, he worked in a similar department that was responsible for making changes to manufacturing plans. He received a fifteen-year service award in 2011.

In 2012, Burnett obtained a position as a senior manufacturing operations specialist, his first nonunion job at Bell Helicopter. When he took the position, he understood that it would be more demanding and that it required different skills than his union jobs, including enhanced communication skills. The position paid

him approximately $47 per hour to oversee the assembly of certain parts and the transfer of those parts to Bell Helicopter's representatives in Canada, where the final assembly of Bell Helicopter's "412" aircraft—its most profitable helicopter—occurred. Burnett's position required him to prepare for and host online meetings with the Canadian representatives; his job description required him to, among other tasks, prepare and deliver oral presentations. The Canadian representatives depended on the information from employees in Texas for planning how the representatives could meet commitments to customers.

Carisa Kimbro first supervised Burnett in his operations specialist position. In her first evaluation of Burnett, she described his overall performance as "on target" and "solid." She wrote in part,

> Through 2012, Brian has shown great improvement on how he manages the 412 program, moving from a more defensive to offensive strategy[.] [H]e is becoming better at finding solutions to issues earlier and will look for continued improvement in 2013. . . .
>
> Presentation of information is one of the most important facets of this position. In the current environment, conference rooms and a directed presentation of program status [are] our major means of projecting . . . performance and informing multiple levels of management and many customers on our current position. 2013 should be used to hone the visual presentation of information and [to] clearly and concisely present[] the key messages.
>
> With his prior experience, Brian has a depth of knowledge that has aided in his helping train new personnel within the group. We will continue to look for Brian to be a major team player . . . .

In 2012, Rebecca Rosenbaum, who was in her early thirties, began preparing to replace Kimbro as Burnett's supervisor. According to Rosenbaum,

when she observed Burnett in meetings that year, she concluded that his "communication was not as crisp or as clear" as other employees and that there were "significant challenges to his program."

During Burnett's time as an operations specialist, Bell Helicopter's attempt to use a new computer system caused significant problems for the entire company. Burnett's department began having daily calls with the Canadian representatives about the assembly and shipping of transmissions and gearboxes. Burnett and Rosenbaum often participated together in the calls. Also, once a week, Burnett used a PowerPoint presentation to communicate with the Canadian representatives. The PowerPoint presentation included information about aircraft parts and about "critical areas that [Burnett] thought [he] needed to bring to management's attention."

In the first quarter of 2013, Rosenbaum replaced Kimbro. At that time, Burnett was thirty-nine years old, was balding, and had gray in his beard. In the spring and summer of 2013, Rosenbaum noticed several problems in Burnett's performance. She later explained,

> There were several occasions when he did not turn in deliverables on time. His communication in meetings was not at the level that we needed to . . . make sure that the audience understood what was going on with his program. There was not enough engagement or communication with other parties within the plant outside of these formal meetings around performance of the programs. . . . There wasn't enough early elevation of issues so that we could prevent some of the problems or help problem solve to make better decisions to improve the overall performance of the programs that he was responsible for.

Rosenbaum had several informal discussions with Burnett about these concerns. She later testified,

> I always tried to give balanced feedback, but certainly there was negative feedback in those meetings . . . .
>
> So we discussed in detail the areas that needed to be improved[.] . . . [T]here was a lot of focus around the need to improve communication . . . with myself and leadership within the factory, but also communication outside in more formal settings and even informal settings with particular customers . . . who were very dependent upon the information from our center in order to do their own planning and ensure that they could meet their commitments to their customers.

Eventually, Burnett asked Rosenbaum to provide "some relief off the lower priority programs that [he] had" and "told her if that if somebody could help [him] with those[,] then [he] could spend more time with the 412 program and help improve that program." Rosenbaum responded to his request by giving some of his work to an older employee so that he could "focus on the communication and the critical deliverables that were so key to making the programs that he was responsible for successful."

On June 17, 2013, Rosenbaum wrote Burnett a letter that described problems with his performance. The letter stated that Burnett was not meeting expectations in two ways: he was "not completing deliverables on time and without errors," and he needed to "improve communication with manufacturing, assembly, procurement[,] and customers." Under the subheading relating to not completing deliverables, the letter referred to a "7:45 Daily Canada Call on 5/16."

Burnett testified that he missed a meeting on that day because he was sick.

Rosenbaum testified,

> We had a daily 7:45 call with . . . Canada, to go over the status of all of the key deliverables. We were behind schedule and it was a key communication point so that they understood and could plan their production schedule.
>
> As part of this, Mr. Burnett had to provide me daily a status update on where all the key deliverables on his program were, and on this particular date he did not provide that. I didn't get any information at all and didn't get anything until a text after the meeting was over that he was not coming to work that day.
>
> . . . .
>
> I wrote him up because he didn't take alternative methods to prepare for the meeting.

Also under the "deliverables" heading, Rosenbaum's letter described Burnett's failure to have an "[e]rror free program review [on] 6/13." Concerning this error, according to Burnett, Rosenbaum explained to him that he had made some font errors on PowerPoint slides and had included unnecessary information on a slide. Rosenbaum testified regarding that error,

> [T]his particular week in the middle of June, there were a number of errors in his program review and on the line of balance, which communicates incorrect or less accurate information to the team.
>
> And, you know, formatting is one piece of that. I think when you're presenting, particularly at that level of the organization, a general manager or a VP, formatting is very important. It helps to ensure that they're focused on the right things, and if there is formatting or other issues, it's a distraction and then an executive is not taking away the key content that they need to from that presentation.

Under the same heading, the letter referred to a "412 Program Review update for Mike Scruggs 6/14." With respect to this alleged failure, according to Burnett, Rosenbaum accused him of failing to complete a program review (a PowerPoint presentation with "bells and whistles") but had asked him only to complete a less-detailed program summary, which he did. According to Rosenbaum,

> Mike Scruggs was the VP who the center reported in through. And we did regular program reviews for him. And this program review was not completed in the way that we had outlined that we needed for this review. It was not the first one that we had done for him. We changed the format slightly from time to time. But the rest of the team was able to deliver the slides, the program review that they needed to, and Mr. Burnett's was insufficient. It didn't have all of the information that was required for that meeting.

Under the "communication" heading, the letter provided four more alleged deficiencies: "[p]rioritization based on ship alignment for customer," "[m]issing parts on kits—delay for on time start," "[p]ush Huey II as well as 412 on quills to meet recovery," and "[e]mphasis on dates that do not support need or slip." Burnett and Rosenbaum later provided testimony about each of these alleged deficiencies.

In the letter, Rosenbaum stated that in the next twenty-one days, she expected Burnett to, among other tasks, make on time and accurate daily reports to the Canadian representatives; complete, without errors, program reviews; check in "with assembly . . . to ensure priorities are aligned"; and "[i]ncrease functionality in Excel including graphs, conditional formatting, formatting, etc."

7

The letter ended by stating, "This is a written warning to meet expectations for performance within 21 days or receive additional discipline up to and including termination."

According to Burnett, Rosenbaum's letter, which he signed,[1] "completely surprised" him. Rosenbaum testified that upon Burnett's receipt of the letter, he agreed that he needed to improve in the areas that the letter had described. Burnett was the only employee to whom Rosenbaum had ever given written discipline.

Burnett testified that after he received the letter, he met all of the expectations, and Rosenbaum told him that he had improved on the areas that the letter had designated. But according to Rosenbaum, Burnett's overall performance did not improve, and during a conversation that occurred after he received the letter, he acknowledged to Rosenbaum that he was not meeting her expectations and that the job was not a "good fit for him."[2] After Burnett received

---

[1]Rosenbaum testified, "Burnett signing the document was, to me, his agreement with the document." Rosenbaum testified that she viewed the letter as a stage within progressive discipline.

[2]During Burnett's cross-examination, the following exchange occurred:

Q. Do you recall telling Ms. Rosenbaum that you didn't believe that the job was a good fit for you?

A. Not until the -- early August [2013] when she told me that things weren't working out and that I should seek a job somewhere else within the company.

8

the letter, Bell Helicopter attempted to find him another job within the company, but Rosenbaum later testified that "none of the other centers were willing to move [Burnett] into a position."

After giving Burnett the letter, Rosenbaum provided him with a mid-year evaluation. The evaluation stated in part,

> During the first half of the year Brian's deliverables often had formatting errors and incomplete information. He has worked to improve, but continued development of his program review and ensuring all end deliverables . . . are included will greatly improve the value of this deliverable. Brian needs to work on improving his communication around issues that are impacting his program. . . .
>
> Comments by Brian J Burnett:
>
> After the format and automated macro changes were made to our Program Review slides [i]t took some adjustment and I worked . . . on some issues I was having that caused some of the formatting issues. There have been improvements made which [have] helped to greatly improve the ease of [inputting] data and navigating between slides. This has been a challenging year . . . due to all of the system changes, labor disruptions, demand volatility, and procurement . . . that [have] created many procured parts to start late. I have tried hard to give early warning and look to improve communication as we work through the many challenges we face on a dally basis.

The evaluation also stated that Burnett had successfully allocated "parts between his programs," had "supported legacy spares during the first half of the year," had "done [a] great job learning . . . new systems . . . and . . . solving

---

> Q. So at that time you agreed that the job as senior manufacturing operations specialist was not a good fit for you?
>
> A. It was my opinion after that, after what I had been going through with her, yes.

9

issues," and had "worked hard through a challenging relationship with the dispatcher supporting his program." The evaluation cautioned, however, that he needed to improve "his communication both in tone and frequency."

According to Rosenbaum, she decided to fire Burnett in July 2013, when he was thirty-nine years old. She did not immediately inform him of the decision because she needed to discuss it with Bell Helicopter's human resources department and because Burnett was going on vacation.

On August 20, 2013, Bell Helicopter officially fired Burnett. He had turned forty years old sixteen days before his termination. According to Rosenbaum, she was not aware of Burnett's age at that time. In a form that Rosenbaum completed for the termination, she stated that Burnett had "[p]oor communication skills to management."

To replace Burnett, Bell Helicopter promoted Candice Sharp,[3] who was twenty-nine years old and had a younger appearance than Burnett. Regarding the decision to promote Sharp, Rosenbaum testified,

> [S]he had a strong educational background. She had both a bachelor's [degree] and an MBA.[4] She had also, I believe, just received her . . . performance management certificate. She also had strong performances on her performance evaluations. She was a strong communicator and had worked in the finance organization on

[3]The record and the parties' briefs contain different spellings of Sharp's name. The reporter's record refers to her as "Candice Sharp," and we will use that spelling.

[4]Burnett graduated high school and took one business management course at a junior college.

programs, on the V-22 program at Bell up until that point. And I thought she would be an asset to the team.

Burnett sued Bell Helicopter. He pleaded that Bell Helicopter had violated section 21.051 of the labor code[5] by firing him because of his age. He asked for an award of damages that included lost wages, lost earning capacity, and mental anguish. Bell Helicopter answered with a general denial and by pleading several affirmative defenses, including that it "would have taken the same action in the absence of the alleged impermissible motivating factor."

At a bench trial, Burnett acknowledged that he had made errors on PowerPoint slides used in his reports to the Canadian representatives. He explained that the errors had occurred, in part, because his department had "other issues going on" and "didn't have a lot of time to focus on the small details of a font and formatting, stuff like that." Burnett also testified that "quite often," he saw a younger operations specialist, Greg Isler, make typographical errors on those presentations without receiving discipline.

When Burnett's counsel asked him why he was "here today," Burnett responded,

> I'm here because I want to stand up for what I feel is unjust. I don't think that any of the negative documents that are in here accurately portray what I gave Bell.

---

[5]*See* Tex. Lab. Code Ann. § 21.051(1) (West 2015). Burnett also pleaded a claim of racial discrimination, but he nonsuited that claim at trial.

11

And what I saw out there in the last year of my career made me feel that what was happening was older workers being replaced with younger people. . . .

. . . [A]fter I was terminated, I was able to reflect back on the last year of my career out there, and I knew what was going on. I saw it firsthand. I saw it with my own eyes. And when I found out that my position ended up the same way many other positions had happened in front of me, I felt like I had to fight. I had to fight because it is wrong. I gave my all to that company. I didn't deserve it. And who they replaced me with was not any more qualified than I was for that position. And I believe the record shows at the end of all this that to be true.

During Burnett's cross-examination by Bell Helicopter's counsel, the following exchange occurred:

Q. At any time that [Rosenbaum] was giving you feedback, did you think she was doing it because you were 39 years old?

A. Not because I was 39, no.

Later, Burnett testified that Rosenbaum's criticism of his performance was because of his age. He acknowledged that when Rosenbaum gave him written criticisms of his performance, he was not yet forty years old. During his employment at Bell Helicopter, Burnett never told a supervisor that he believed he was being discriminated against because of his age, and he never filed an age discrimination complaint with the company's human resources department.

Russell Creamer, who had worked closely with Burnett, testified on Burnett's behalf. According to Creamer, Burnett was professional, prepared, respectful, and hard-working. Creamer testified that Rosenbaum "popp[ed] the whip" with Burnett. He explained that Rosenbaum spoke unprofessionally to

12

Burnett and that younger employees received different, more respectful treatment.[6] Creamer believed that Burnett's age factored into Rosenbaum's decision to fire him. He also testified that Sharp, Burnett's replacement, had a significantly-younger appearance than Burnett.

Creamer testified that he had noticed a trend of Bell Helicopter "trying to get rid of older people and bring in the newer, younger people." He explained that there were "lots more" Bell Helicopter employees in their twenties and thirties than there had been three or four years prior. Creamer testified that Bell Helicopter had engaged in "several layoffs and . . . several voluntary separation packages . . . to get rid of some of the older people and bring in the young." He explained, "I've never seen [Bell Helicopter] lay off the younger people that they replace the older people with."

In Rosenbaum's testimony, she expressly denied that she had ever hired or fired anyone because of age. She testified that in her supervisory role at Bell Helicopter, she had hired an operations specialist who was in his mid-forties because she believed he would "do an excellent job in the role." She also testified that other operations specialists that she supervised at Bell Helicopter were in their late thirties, forties, and fifties, and that she never disciplined any of those employees. Rosenbaum testified that no employee other than Burnett had ever accused her of any form of discrimination.

---

[6]Creamer testified that he also saw Rosenbaum speaking rudely to other employees.

Sharp, who no longer worked for Bell Helicopter at the time of the trial, testified that a "very important" part of her job as an operations specialist was to have good communication skills. She explained,

> I had to deal with everybody from a VP down to a dispatcher on the floor. I had to be able to communicate at all levels and at the level that would be expected for that type of employee. I would communicate from 6:00 a.m. until 5:00 or whenever I felt like my job was done.

After the trial, the trial court sent a letter to the parties to inform them of its ruling for Burnett.[7] After the parties filed various posttrial documents, the trial court[8] signed a final judgment. The court awarded Burnett damages of

---

[7]Bell Helicopter devotes a significant portion of its argument to its assertion that language in the trial court's letter ruling does not rationally support its findings and its judgment. But the letter ruling is not "competent evidence of the trial court's basis for judgment." *Cherokee Water Co. v. Gregg Cty. Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990); *Burgess v. Denton Cty.*, 359 S.W.3d 351, 359 n.37 (Tex. App.—Fort Worth 2012, no pet.) (citing *Cherokee Water* and concluding that a trial court's prejudgment letter to the parties stating the basis for judgment did not constitute findings of fact or conclusions of law); *see AIMS ATM, LLC v. Sanip Enters.*, No. 01-13-00155-CV, 2014 WL 810839, at *1 n.1 (Tex. App.—Houston [1st Dist.] Feb. 27, 2014, no pet.) (mem. op.) ("Explanatory letters from the trial court preceding a judgment do not impact the standard or scope of our appellate review."). Thus, we decline to analyze whether the rationale that the trial court expressed in its letter supports its judgment. *But see In re Estate of Miller*, 446 S.W.3d 445, 452 (Tex. App.—Tyler 2014, no pet.) (relying on language in a letter as expressing a trial court's findings and conclusions when the court did not file formal findings of fact and conclusions of law).

[8]During the course of the proceedings below, this case was transferred from the 153rd District Court to the 48th District Court and then back to the 153rd District Court. The presiding judge of the 153rd District Court conducted the bench trial; the presiding judge of the 48th District Court signed the judgment; and the presiding judge of the 153rd District Court ruled on postjudgment matters, including issuing findings of fact and conclusions of law.

$864,420.51. The court also awarded him $50,200 in attorney's fees incurred in the trial court, additional sums for conditional appellate attorney's fees, and costs. The court entered the following findings of fact and conclusions of law, among other findings and conclusions:

## FINDINGS OF FACT

1. Plaintiff was forty (40) years old when he was terminated by Defendant. Plaintiff had gray in his beard and hair.

2. Plaintiff was employed by Defendant for over seventeen (17) years. During his 17[-]year employment, Plaintiff was repeatedly praised for his work, often promoted, and his last annual performance evaluation rated his work as "on target, solid performance."

3. Plaintiff's supervisor was Rebecca Rosenbaum. Rebecca Rosenbaum was thirty-two (32) years old. Rebecca Rosenbaum had recently replaced [Plaintiff's] prior supervisor and had little experience in operations management. Rebecca Rosenbaum made the decision to terminate Plaintiff.

4. Defendant replaced Plaintiff with an employee who was twenty-nine (29) years old.

5. Plaintiff's age was a motivating factor in Defendant's termination of Plaintiff.

6. Defendant would not have terminated Plaintiff when it did absent the age[-]motivating factor.

7. Defendant's stated reason for terminating Plaintiff was a mere pretext for unlawful age discrimination.

8. Defendant failed to follow its policies in the discipline and termination of Plaintiff.

9. Plaintiff's co-worker Richard Creamer[,] who worked next to Plaintiff[,] testified that in his opinion, Rebecca Rosenbaum terminated Plaintiff due to his age.

. . . .

**CONCLUSIONS OF LAW**

1. Defendant terminated Plaintiff because of his age in violation of [section] 21.051 of the Texas Labor Code.

After unsuccessfully moving for a new trial, Bell Helicopter brought this appeal.

**The Sufficiency of the Evidence on Liability**

In its first four issues, Bell Helicopter argues that the evidence is legally or factually insufficient to support findings that undergird the trial court's age-discrimination conclusion. Bell Helicopter challenges the sufficiency of the evidence to show that age was a motivating factor in Burnett's termination; that Bell Helicopter's stated reason for terminating Burnett was a pretext for unlawful discrimination; that Bell Helicopter would not have terminated Burnett without an age-related motivation; and that Rosenbaum "took [into] account" a statement by Bell Helicopter's CEO, John Garrison, that he wanted the company to hire "fresh faces right out of college." We will consider these challenged findings, including the sufficiency of the evidence to support them, together.

Bell Helicopter argues that Burnett was "ultimately terminated because of his poor communication skills and poor weekly presentations to management" and that there is "no probative evidence that age had anything to do with . . . Rosenbaum's [termination] decision." Burnett contends that Bell Helicopter's arguments depend upon "disputed evidence that disregards the basis for the trial

16

court's judgment." He asserts that this is the "classic case in which the factfinder must resolve disputed facts after . . . evaluating the truth of competing versions of events."

**Standards of review**

We may sustain a legal sufficiency challenge only when the record discloses a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support a finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). But when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*,

17

118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.*

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

In a bench trial, "the trial court, as fact finder, is the sole judge of the credibility of the witnesses. The trial court may take into account all the surrounding facts and circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony." *Shear Cuts, Inc. v. Littlejohn*, 141 S.W.3d 264, 270–71 (Tex. App.—Fort Worth 2004, no pet.)

18

(citation omitted); *see also Scott v. Christian Methodist Episcopal Church*, No. 02-10-00434-CV, 2012 WL 42991, at *2 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (mem. op.) (explaining that unlike a factfinder, an appellate court does not witness "the demeanor of those testifying—their voice inflections, body movements, pauses in speech, and other overall visual and verbal cues—which can affect the [factfinder's] determination of the veracity of their testimonies").

**Liability for age discrimination under chapter 21 of the labor code**

The Legislature enacted chapter 21 of the labor code to "secure for persons in this state . . . freedom from discrimination in certain employment transactions."[9]  Tex. Lab. Code Ann. § 21.001(4) (West 2015).  Under chapter 21, an employer commits an unlawful employment practice by discharging an employee because of age.  *Id.* § 21.051(1).  The provisions of chapter 21 prohibiting discrimination because of age "apply only to discrimination against an individual 40 years of age or older."  *Id.* § 21.101 (West 2015); *see Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 638 n.54 (Tex. 2012) ("Under both state and federal law, the protected class for age discrimination claims consists of those 40 years of age and older.").  A discharge is unlawful if the plaintiff proves that age was a "motivating factor," even if other factors also motivated the

---

[9]The Legislature intends to correlate state law with federal law in employment discrimination cases; thus, we may rely on federal decisions to interpret and apply chapter 21.  *Burton v. Carter BloodCare*, No. 02-11-00003-CV, 2012 WL 42899, at *5 n.7 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (mem. op.); *see Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 432 (Tex. App.—Fort Worth 2009, pet. denied).

discharge. Tex. Lab. Code Ann. § 21.125(a) (West 2015). Upon finding that an employer discriminated against an employee under chapter 21, a court may generally award the employee damages, attorney's fees, and costs. *Id.* §§ 21.2585(a)(1), .259(a) (West 2015). *But see id.* § 21.125(b) (stating that if an employer demonstrates that it would have taken the same action in the absence of the impermissible motivating factor, the court may grant declaratory and injunctive relief along with attorney's fees but may not award damages).

In chapter 21 discrimination cases that have not been tried on the merits, we apply a burden-shifting analysis. *See Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003). First, the plaintiff must prove a prima facie case of discrimination. *Burton*, 2012 WL 42899, at *6. The prima facie case includes four elements that Burnett established: he was in the protected class (meaning that he was at least forty years old), he was discharged while in the protected class, he was qualified for the position from which he was discharged, and he was replaced by someone younger. *Mission Consol. ISD*, 372 S.W.3d at 642; *see also Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000). If the plaintiff proves a prima facie case, the defendant must show a nondiscriminatory reason for the employment decision, and the plaintiff must then show that the defendant's reason was a pretext for unlawful discrimination. *Burton*, 2012 WL 42899, at *6.

But when, as here, a discrimination case has been fully litigated, we do not use the burden-shifting analysis. *Wal-Mart Stores*, 121 S.W.3d at 739. Instead,

20

we ask "whether the evidence is . . . sufficient to support the [factfinder's] ultimate finding" that unlawful discrimination was a motivating factor for the employment decision. *See id.*; *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) (emphasizing that "'a motivating factor' is the correct standard of causation for the plaintiff in all [chapter 21] unlawful employment practice claims").

Even in a fully-litigated case, however, the factfinder still considers the credibility of the employer's reasons for termination and whether those reasons were a pretext for unlawful discrimination. *See Wal-Mart Stores*, 121 S.W.3d at 739–40 (emphasizing that a plaintiff must show that the reason for termination proffered by the employer was false and that discrimination was the real reason); *Elgaghil v. Tarrant Cty. Junior Coll.*, 45 S.W.3d 133, 140 (Tex. App.—Fort Worth 2000, pet. denied) (stating the same). Direct or circumstantial evidence may prove discrimination. *Harris Cty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 196 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see Reeves*, 530 U.S. at 141, 120 S. Ct. at 2105 (noting that there will seldom be testimony concerning an employer's mental processes); *Mission Consol.*, 372 S.W.3d at 634 (explaining that discriminatory "motives are often more covert than overt"); *Coll. of the Mainland v. Glover*, 436 S.W.3d 384, 392 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (recognizing that direct evidence of discrimination is rare).

In its fifth and sixth findings of fact, the trial court found that Burnett's age motivated Bell Helicopter's termination decision and that Bell Helicopter would

not have terminated him "absent the age[-]motivating factor." In its seventh finding of fact, the trial court found that Bell Helicopter's proffered reason for terminating Burnett's employment was a pretext for unlawful discrimination. Defending these findings, Burnett asserts that the evidence shows a lack of credibility in the basis for termination proffered by Bell Helicopter. *See Reeves*, 530 U.S. at 143–47, 120 S. Ct. at 2106–08 (explaining that a plaintiff may show intentional discrimination by proving that an employer's reasons for termination were unworthy of credence).

We agree that in its role as the sole judge of the witnesses' credibility, the trial court could have found that Bell Helicopter's basis for terminating Burnett was not credible and that this lack of credibility served as proof of an age-discriminatory motive for the termination. Rosenbaum testified that Burnett did not communicate as crisply or as clearly as other employees. She explained that he had poor interaction with other employees and that his "communication in meetings was not at the level that [Bell Helicopter] needed to . . . make sure that the audience understood what was going on with his program." She testified that before firing Burnett, she had talked with him about his need to improve communication in formal and informal settings.

With regard to the specific problems with Burnett's performance that she included in his written discipline letter, Rosenbaum testified that (1) on one occasion, he had failed to provide a status update for use in a meeting with the Canadian representatives; (2) on a day in June 2013, he had made a "number of

22

errors in his program review and on the line of balance, which communicates incorrect or less accurate information to the team"; (3) on another day in June 2013, he had failed to complete a program review in the way she had requested; (4) he had failed to properly prioritize the delivery of certain aircraft parts over others; (5) he had failed to ensure that there were no "gaps" in kits of parts needed to build gearboxes; and (6) he needed to be more proactive in finding solutions to problems within manufacturing that caused assembly delays. In sum, Rosenbaum testified that she terminated Burnett's employment "because his performance did not meet expectations and he was not performing at the same level as his colleagues who were doing similar work."

Burnett testified, however, that before Rosenbaum began supervising him, Kimbro had evaluated him as having an "on target" and "solid" performance, and she had written that he would be considered a "major team player" in the future at Bell Helicopter. Although Kimbro's 2012 evaluation stated that Burnett should use 2013 to "hone visual presentation of information and clearly and concisely present[] the key messages," it nonetheless expressed her overall approval of his performance, reciting that each day, he was "learning something new and getting stronger in his position." Evidence that an employer is "pleased with an employee's work performance supports a finding of pretext when that evidence contradicts the reason given by the employer of poor performance." *Dell, Inc. v. Wise*, 424 S.W.3d 100, 112 (Tex. App.—Eastland 2013, no pet.).

23

Burnett also testified that many of his department's problems in ensuring that it collected parts necessary for assembling gearboxes stemmed from Bell Helicopter's switch to a new computer program in 2013. He provided testimony about each of Rosenbaum's alleged concerns with his performance detailed above and explained how the concerns were misplaced, beyond his control, or insignificant. He also testified that after receiving Rosenbaum's letter, he performed all of the tasks that she had sought his improvement on, and she told him that he had improved his performance.

After hearing all of this evidence, the trial court rejected Bell Helicopter's proffered reasons for terminating Burnett's employment as a "mere pretext for unlawful age discrimination." The evidence does not persuade us to second-guess that finding. *See Laxton v. Gap Inc.*, 333 F.3d 572, 585 (5th Cir. 2003) ("[T]he parties presented the jury with two competing versions of [the employee's] termination. . . . It is the province of the [factfinder] to judge the credibility of witnesses and resolve conflicts in the evidence, and we will not second-guess its rejection of [the employer's] proffered justification.").

Moreover, Burnett testified that to the extent that he deficiently performed his job functions, Isler, a younger employee,[10] had similar deficiencies without

_____

[10]Burnett initially testified that Isler was "quite a bit younger" than he was; he described Isler as being in his "early thirties." He later testified, in responding to a representation by Bell Helicopter's counsel, that he had no reason to doubt that Isler was two years younger than he was, although he stated that Isler had a "baby face." Rosenbaum testified that when she supervised Isler, he was in his late thirties. The trial court could have resolved these testimonial conflicts in

24

receiving discipline. *See Kaplan v. City of Sugar Land*, 525 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (explaining that a plaintiff may establish that an employer's proffered reason for an employment action is pretextual "by showing that the employer treated the plaintiff more harshly than other similarly situated employees for nearly identical conduct"); *see also Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (stating that compared employment actions will be deemed to have been taken under nearly identical circumstances when employees held the same job or responsibilities, shared the same supervisor or had employment status determined by same person, and had essentially comparable violation histories); *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 737 (S.D. Tex. 2014) (stating that one way to show that a defendant's proffered ground for termination is not credible is through "a disparate treatment theory using comparators"). Burnett testified that Isler was "responsible for commercial aircraft as well as . . . the similar programs that [Burnett] had." He explained, "[Isler] and I worked . . . side by side physically and our programs were very much alike. . . ."

> In describing the kinds of errors that he and Isler made, Burnett testified,
>
> From one day to the next, there may be a date that's wrong. Just a date of the presentation, you know, just as simple as that. It may be when you go in -- we did meetings once a week for these PowerPoint slides. We're both guilty of not updating that next week's date. It showed last week's date, you know, stuff like that.

favor of Burnett's original assertion that Isler was substantially younger than he was. *See Shear Cuts, Inc.*, 141 S.W.3d at 270–71.

25

So it wasn't anything that affected the manufacturing process or the schedule, but we were both, you know, guilty of that. You know, those things that I was being written up for were very similar.

Later, Burnett testified,

[Isler] was under the same constraints that I was. Many of his programs were delayed on time starts. There were errors, formatting and typographical errors, on his program slides. They were no different than mine. And he was treated better than I was.

. . . .

I worked right next to him 12 to 14 hours a day, and he was treated differently than I was. He wasn't hounded like I was. . . . [T]here were numerous occasions after the write-up that [Rosenbaum] would come out of her office and come physically running up to me and show me a date and a transmission and tell me, ["]This has got to go today. This has got to go today, no matter what.["] And all the weeks leading up to that point, and to that day, every day that I would report on my parts, it clearly showed that we were still short parts for this transmission. And even if we had all the parts, it would take, at a minimum, three days to complete the transmission. . . .

She would come to me [and say], ["]This has got to go today, no exceptions.["]

["][Rosenbaum], the transmission is not even in assembly yet. We're missing parts. It can't go today.["]

And I would speak to her just like that. And, ["]I don't care. Find a way.["] And she'd storm off.

Greg Isler, sitting 2 feet away from me, many of his assemblies were in the same arena. They were short parts. They were promised two days ago. And they're not even in assembly. That was being -- I was being treated differently. That same product, that same transmission I was getting unjustly beat up on when he wasn't.

. . . .

. . . [T]here were occasions that [Rosenbaum] would discuss with [Isler] certain things that needed to be done on his program, but not to the degree that she did with me.

Burnett also explained that Rosenbaum chose Isler to attend training that Burnett told her he wanted to go to.

From Burnett's testimony disputing his alleged deficiencies and describing Isler's more favorable treatment, the trial court could have reasonably concluded that Bell Helicopter's grounds for his termination were not credible. *See Wal-Mart Stores*, 121 S.W.3d at 739–40; *Elgaghil*, 45 S.W.3d at 140. And from this evidence, the trial court could have found that the real reason for the termination was age discrimination. *See Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108 ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation [of the grounds for termination]." (emphasis omitted)).

Further, Russell Creamer, who was employed at Bell Helicopter during Burnett's tenure and at the time of trial, testified that he worked closely with Burnett and had "quite a bit of interaction" with him;[11] that Burnett was a good, professional, and resourceful employee; that he watched Rosenbaum supervise and direct Burnett; that Rosenbaum acted more respectfully with younger employees than with older employees; that Bell Helicopter's trend in nonunion positions was "trying to get rid of older people and bring in the newer, younger

---

[11]More specifically, Creamer testified that on a daily basis, he and Burnett worked together to obtain aircraft parts.

people"; and that Bell Helicopter tended to lay off older employees before laying off younger employees. From these facts, Creamer concluded that Rosenbaum terminated Burnett's employment because of his age. Creamer's opinion testimony, which tethered to his first-hand observations of Burnett, of Rosenbaum, and of Bell Helicopter's hiring and firing practices, further supports the trial court's age-motivation findings.[12] *See Haun v. Ideal Indus.*, 81 F.3d 541, 548 (5th Cir. 1996) (holding that in an age discrimination case, a plaintiff's coworker's testimony that the employer was "phasing out older workers" was admissible to prove discrimination); *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1465 (5th Cir.) (relying on a coworker's opinion of an employer's age motivation for the plaintiff's termination because even though the coworker did not have "knowledge of the circumstances leading to . . . termination," the coworker's opinion "rested on his experience" with the employer), *cert. denied*, 493 U.S. 842 (1989); *see also* Tex. R. Evid. 701 (permitting lay witness opinion testimony when the testimony is rationally based on the witness's perception and is helpful to determining a fact in issue); *Gossett v. Okla. ex rel. Bd. of Regents*

---

[12]Bell Helicopter relies on *Lind v. UNC, Inc.* to argue that Creamer's testimony is not probative of discrimination. 36 F. Supp. 2d 350, 359 (N.D. Tex. 1999). But there, two of the three coworkers who opined about age discrimination against the plaintiff were not employees at the time of the plaintiff's termination, and none of the three coworkers demonstrated "requisite personal knowledge" supporting their opinions. *Id.* We therefore conclude that *Lind* is distinguishable. *See id.*; *see also Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995) (holding that a coworker's opinion of discrimination against the plaintiff was not probative when the coworker admitted that the opinion was "only conjecture"), *cert. denied*, 516 U.S. 1047 (1996).

*for Langston Univ.*, 245 F.3d 1172, 1178–80 (10th Cir. 2001) (citing *Hansard* and reaching a similar conclusion).[13]

We recognize that the record contains evidence—in addition to Bell Helicopter's proffered age-neutral termination justification, which the trial court rejected—that weighs against the trial court's challenged findings and conclusion on age discrimination. For example, Burnett testified that he never told any supervisor that he was being discriminated against because of age while employed at Bell Helicopter and never filed an age-discrimination complaint. Also, the evidence showed that Rosenbaum did not discipline or terminate supervised employees who were older than Burnett. We cannot conclude, however, that in balancing this and other evidence weighing against a finding of

[13]To prove discriminatory animus, Burnett also relies on evidence showing that Bell Helicopter's CEO, John Garrison, wanted to bring new college graduates into the company. We do not rely on this evidence in reaching our holding that the remaining evidence is sufficient to support the trial court's conclusion of law on discrimination and its judgment. Thus, we decline to address Bell Helicopter's argument that the evidence is insufficient to support the trial court's tenth finding of fact, which relates to Garrison's statement about hiring new college graduates, and we overrule his third issue. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *Mehan v. WAMCO XXVIII, Ltd.*, 138 S.W.3d 415, 419 n.4 (Tex. App.—Fort Worth 2004, no pet.) (declining to address the sufficiency of evidence to prove a finding of fact when other findings supported challenged conclusions of law).

We also do not predicate our holding on Burnett's narrative response (which we have quoted above) to his counsel's question about why he had sued Bell Helicopter; we recognize that an employee's subjective belief of discrimination, standing alone, cannot support a claim under chapter 21. *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 375 (Tex. App.—Fort Worth 2006, no pet.).

discriminatory animus, the trial court unreasonably gave more weight to the evidence and inferences supporting age discrimination, which we have discussed above. *See Robertson v. Robertson*, 323 S.W.2d 938, 942 (Tex. 1959) (stating that the factfinder has the "sole right to weigh the evidence" and that an appellate court may not "substitute its findings and conclusions for that of the [factfinder]").

Finally, we recognize that if, as the dissenting opinion proposes, the law does not allow for an employer's acts that occur before an employee turns forty years old to serve as circumstantial evidence of discriminatory animus for termination that occurs after the employee turns forty, Burnett's age discrimination claim could not succeed. As the dissenting opinion states, all of the circumstantial evidence that Burnett relies on to show discriminatory animus relates to facts that occurred before he turned forty. But we do not read the applicable provisions of the labor code as narrowly as the dissenting opinion, which would appear to hold that the employee must prove that the employer discriminated against the employee because the employee was over forty. Rather, construing the labor code's provisions together with federal decisional authority, we conclude that an employee must show that the employer discriminated "because of . . . age" and that the employee was at least forty when the ultimate act of discrimination—the termination—occurred. *See* Tex. Lab. Code Ann. §§ 21.051, 21.101; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 1310 (1996) (explaining that federal law "does not ban discrimination against employees because they are aged 40 or older; it

30

bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older"); C*harles v. D.C. Dep't of Youth Rehab. Servs.*, 690 F. App'x 14, 16 (D.C. Cir. 2017) (explaining that the "prohibited act of discrimination occurs when a decision to terminate is made final, is communicated to the employee, and is no longer subject to reconsideration"); *Brown v. Northside Hosp.*, 311 F. App'x 217, 222 (11th Cir. 2009) (explaining that federal law "prohibits an employer from discriminating against a person who is forty or older on the basis of age").

For all of these reasons, applying the standards of review articulated above, we hold that the evidence is legally and factually sufficient to support the trial court's challenged age-discrimination liability findings—its fifth, sixth, and seventh findings of fact. *See Ford Motor Co.*, 444 S.W.3d at 620; *Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. We overrule Bell Helicopter's first, second, and fourth issues.

## Damages

In its fifth issue, Bell Helicopter argues that the trial court erred by awarding Burnett $565,563.87 for "lost wages in the future," otherwise known as front pay. Bell Helicopter contends that (1) the trial court could not award front pay because Burnett did not prove that reinstatement to his position at Bell Helicopter was not feasible; and (2) even if Burnett proved that reinstatement was not feasible, he did not present competent evidence proving an amount of

front pay.  In its sixth issue, Bell Helicopter argues that any damages for front pay and for future mental anguish were subject to a statutory cap.

**Front pay**

"Front pay" is a wrongfully-discharged plaintiff's compensation for future lost wages and benefits.  *Office of the Att'y Gen. of Tex. v. Rodriguez*, 535 S.W.3d 54, 83 (Tex. App.—El Paso 2017, pet. filed); *Dell, Inc.*, 424 S.W.3d at 114.  A front pay award serves to make victims of discrimination "whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment."  *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984).

We review a factfinder's equitable award of front pay for an abuse of discretion.  *River City Care Ctr. v. Taylor*, No. 04-14-00078-CV, 2015 WL 3773362, at *1 (Tex. App.—San Antonio June 17, 2015, pet. denied) (mem. op.); *Tex. Youth Comm'n v. Koustoubardis*, 378 S.W.3d 497, 502 (Tex. App.—Dallas 2012, no pet.).  A trial court abuses its discretion if it acts arbitrarily and without reference to guiding rules or principles.  *Koustoubardis*, 378 S.W.3d at 502.  The factfinder has wide latitude in determining front pay issues.  *Rodriguez*, 535 S.W.3d at 83.

### Feasibility of reinstatement

Front pay is an equitable alternative only when reinstatement is not feasible.  *Taylor*, 2015 WL 3773362, at *2; *see Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 45 (Tex. App.—Austin 1998, pet. denied).  The employee bears

the burden of showing that reinstatement is not feasible. *Hansard*, 865 F.2d at 1469–70.

Reinstatement is "by far the preferred remedy." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 (5th Cir. 2007); *see Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (stating that reinstatement is the "presumptively favored equitable remedy" and should be granted "in the ordinary case"), *cert. denied*, 513 U.S. 808 (1994). But reinstatement may not be feasible when practicalities such as the unavailability of a position for reinstatement, the displacement of a current employee, or the plaintiff's career change make reinstatement unavailable or when excessive hostility or animosity exists between the parties. *See Palasota*, 499 F.3d at 489; *Thorne v. City of El Segundo*, 802 F.2d 1131, 1137 (9th Cir. 1986).

We conclude that the trial court did not abuse its discretion by implicitly finding[14] that Burnett's reinstatement to a position at Bell Helicopter was not feasible. *See Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 257 (5th Cir. 1996)

---

[14]We recognize that a trial court should ordinarily articulate its reasons for awarding front pay in lieu of reinstatement. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 n.27 (5th Cir. 2001). But in the trial court, Bell Helicopter did not object to the lack of a finding on the feasibility of reinstatement, and on appeal, it does not contest the trial court's award of front pay on the ground that the court did not make an explicit finding concerning the feasibility of reinstatement. We cannot reverse a trial court's judgment on unpreserved or unassigned error. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *see also Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 224 (5th Cir. 2011) ("For the first time on appeal, Host argues that the district court erred when it made no express finding on reinstatement. Since Host did not make this argument to the district court, it is waived.").

("A district court's decision whether to reinstate or award front pay is reviewed only for an abuse of discretion."). The evidence shows that following the termination of Burnett's employment, he became significantly distressed and anxious. He testified, "I just felt empty inside. I was confused. I was in shock. I was scared . . . about my financial future. . . . I couldn't sleep . . . . I didn't know what to do. . . . [I]t took me a while to . . . pull myself together." While Burnett's testimony in this regard does not necessarily reflect continuing animosity or hostility between the parties,[15] the trial court could have reasonably relied on the testimony to find that reinstating Burnett to a position at Bell Helicopter was impractical and unrealistic. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S. Ct. 1946, 1948 (2001) (explaining that an employee's reinstatement may not be "viable because of . . . psychological injuries suffered by the plaintiff as a result of the discrimination"); *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000) (explaining that in deciding whether to compel reinstatement, a trial court may consider whether the plaintiff's termination of employment harmed his emotional well-being).

Furthermore, Burnett testified that after Bell Helicopter terminated his employment, he looked for similar employment before passing an insurance license examination and agreeing to join his wife's insurance agency. The trial court could have reasonably relied on Burnett's career change to find that

---

[15]As Bell Helicopter emphasizes, Rosenbaum no longer works for Bell Helicopter in Texas.

34

reinstatement with Bell Helicopter was not feasible. *See Palasota*, 499 F.3d at 489.

We conclude that the trial court did not abuse its discretion by implicitly finding that Burnett's reinstatement with Bell Helicopter was not feasible. *See Woodhouse*, 92 F.3d at 257. We overrule Bell Helicopter's fifth issue to the extent that it argues otherwise.

### The amount of front pay

Bell Helicopter next argues that no competent evidence established a proper amount of front pay. Because of the speculative nature of front-pay damages, a plaintiff is not required to prove an exact amount of future lost wages but only facts from which a factfinder may determine a proper amount. *Rodriguez*, 535 S.W.3d at 83; *see Dell, Inc.*, 424 S.W.3d at 114 ("Front-pay calculations are inherently speculative because of their prospective nature and are arrived at through intelligent guesswork."). An award of front pay does not depend on the introduction of expert testimony. *Franchina v. City of Providence*, 881 F.3d 32, 59–60 (1st Cir. 2018). We will uphold the award when there is some evidence that a substantial loss occurred and there is a reasonable basis for estimating the amount of the loss. *Dell, Inc.*, 424 S.W.3d at 114; *see Traxler v. Multnomah Cty.*, 596 F.3d 1007, 1014 (9th Cir. 2010) (explaining that an award of front pay is not an abuse of discretion merely because "reasonable minds might disagree regarding the amount").

"Absent evidence to the contrary, it should be assumed that an illegally discharged employee would have continued working for the employer until retirement." *Dell, Inc.*, 424 S.W.3d at 114. Factors that a court may use in determining an amount of front pay include the length of prior employment, the permanency of the position held, the nature of the work, the age and physical condition of the employee, possible consolidation of jobs, and other non-discriminatory factors which could validly affect the employer/employee relationship. *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007)

Bell Helicopter's argument concerning the amount of front pay that the trial court awarded focuses on whether the court properly admitted Plaintiff's Exhibit 12, a summary of Burnett's lost wages, and if so, whether that exhibit adequately supported the trial court's award. Indeed, Bell Helicopter asserts that Plaintiff's Exhibit 12 is the "only arguable" evidence supporting an award of front pay. The exhibit states in part,

Mr. Burnett's hourly rate at Bell was $48.54. Mr. Burnett was terminated on August 20, 2013. . . .

. . . .

Mr. Burnett's total net lost wages in the past are $204,312.00 (lost wages less unemployment and other wages). . . .

From January, 1, 2016 Mr. Burnett will continue to have lost wages in the amount of at least $76,000 a year until age 67, totaling $1,824,000 before reduced for present value. When this amount of future lost wages is reduced for present value over 24 years at a 5% discount rate the total future lost wages equals $565,563.87.

Bell Helicopter argues that the trial court erred by admitting this exhibit over its hearsay objection.[16] Bell Helicopter contends that because the exhibit "should have been excluded . . . and there [is] no other evidence in the record regarding front pay, there is . . . insufficient evidence to support the trial court's award."

We disagree with Bell Helicopter's foundational premise that Plaintiff's Exhibit 12 is the only evidence that the trial court could have relied on to determine Burnett's future lost wages. Without objection, the trial court admitted Plaintiff's Exhibit 13 and Plaintiff's Exhibit 14, which comprised Burnett's W-2 earnings statements for 2011 and 2012 (complete years of employment with Bell Helicopter), 2013 (a year of partial employment with Bell Helicopter), and 2014 (the first full year after his termination). Those exhibits show that in 2011, Burnett earned $111,219.89 in gross pay from Bell Helicopter; that in 2012, he earned $104,027.53; that in 2013, although terminated in August, he earned $73,985.89; and that in 2014, he earned only $9,611.76 from his wife's insurance agency.

From this evidence, the trial court could have reasonably found that Burnett, who was forty-two years old at the time of the trial and who had

---

[16]In response to Bell Helicopter's hearsay objection to Plaintiff's Exhibit 12, the trial court admitted the exhibit as a summary of voluminous records. *See* Tex. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

attempted but failed to obtain comparable alternative employment,[17] would suffer a substantial loss of income until a reasonable retirement age resulting from his termination.[18]  *See Dell, Inc.*, 424 S.W.3d at 114; *see also Tex. Dep't of Pub. Safety v. Williams*, No. 03-08-00466-CV, 2010 WL 797145, at *9 (Tex. App.— Austin Feb. 19, 2010, no pet.) (mem. op.) (affirming an award of $391,485 in front pay and explaining that a factfinder could have reasonably found that the plaintiff would have remained with the employer for eighteen years, until the end of his career).  Furthermore, the trial court could have reasonably relied on the W-2 forms to estimate the amount of the loss.  *See Dell, Inc.*, 424 S.W.3d at 114; *see also Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991) (holding that evidence of what the plaintiff earned before and after her termination justified an award of front pay).  And even assuming an increase from Burnett's 2014 earnings in future years, the trial court could have rationally determined that given the wide disparity between what Burnett earned before and after his termination, over the course of time until he reached retirement, he

---

[17]The trial court admitted documents that proved Burnett's numerous attempts to find comparable employment.

[18]We conclude that the evidence does not overcome the presumption that if Rosenbaum had not terminated him, Burnett would have continued working at Bell Helicopter until his retirement.  *See Dell, Inc.*, 424 S.W.3d at 114.  Burnett worked for Bell Helicopter for seventeen years, and his father and his uncle had each worked for Bell Helicopter for over thirty years before retiring.  *Cf. Cummings v. Standard Register Co.*, 265 F.3d 56, 66 (1st Cir. 2001) (upholding an award of front pay until the plaintiff's estimated retirement age when the plaintiff was a seventeen-year employee of the defendant).

would be damaged to an extent that approximates the court's $565,563.87 award (as discounted for present value).[19]

In accordance with the trial court's wide latitude in determining an inherently speculative amount of front pay—*see Dell, Inc.*, 424 S.W.3d at 114— we conclude that the trial court did not abuse its discretion by awarding Burnett $565,563.87.  *See Williams*, 2010 WL 797145, at *10 ("[T]he evaluation of the [evidentiary] sufficiency of a front pay award does not hinge on whether the [factfinder's] calculations involved some speculation, but whether the [factfinder's] award is supported by more than a scintilla of evidence and falls within the range of options presented at trial.").  Thus, without opining about whether the trial court abused its discretion by admitting Plaintiff's Exhibit 12, we overrule the remaining part of Bell Helicopter's fifth issue in which it complains about the amount of front pay damages.  *See* Tex. R. App. P. 47.1.

**Statutory cap**

Finally, in its sixth issue, Bell Helicopter argues, as it did in the trial court, that the damages for front pay and for future mental anguish were subject to a

---

[19]Although we do not decide whether the trial court abused its discretion by admitting Plaintiff's Exhibit 12, the calculation described in that exhibit provides an example of how the trial court could have used Burnett's pay disparity (before and after his termination) established by his W-2 forms to formulate its award of front pay.

We note that a factfinder may discount future damages to a present value without the introduction of evidence on that subject.  *Missouri Pac. R. Co. v. Kimbrell*, 334 S.W.2d 283, 286–87 (Tex. 1960).

cumulative $300,000 cap. Bell Helicopter relies on section 21.2585 of the labor code, which states in part,

> (a) On finding that a respondent engaged in an unlawful intentional employment practice as alleged in a complaint, a court may, as provided by this section, award:
>
> > (1) compensatory damages; and
> >
> > (2) punitive damages.
>
> . . . .
>
> (d) The sum of the amount of *compensatory damages awarded under this section* for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and the amount of punitive damages awarded under this section may not exceed, for each complainant:
>
> > . . . .
> >
> > (4) $300,000 in the case of a respondent that has more than 500 employees.

Tex. Lab. Code Ann. § 21.2585(a), (d)(4) (emphasis added).

The trial court awarded Burnett $565,563.87 for "lost wages in the future" and $10,000 for "mental anguish damages in the future"; Bell Helicopter contends that these awards are subject to the $300,000 cap under section 21.2585(d)(4). Burnett argues that the $565,563.87 front pay award, an equitable remedy, does not constitute "compensatory damages" subject to the cap. Federal and state authority supports Burnett's position.

In *Pollard*, the Supreme Court, construing a federal statute akin to section 21.2585, held that front pay was not an element of compensatory damages

40

subject to the federal statute's cap. 532 U.S. at 848, 121 S. Ct. at 1949 (interpreting 42 U.S.C. § 1981a(b)(3) (2012) and concluding that front pay was not subject to that subsection's cap even though in "the abstract, front pay could be considered compensation for 'future pecuniary losses'").

Texas courts have consistently relied on *Pollard* to conclude that front pay awarded under chapter 21 of the labor code does not comprise "compensatory damages" subject to section 21.2585(d)'s cap. *See San Antonio Water Sys. v. Nicholas*, 441 S.W.3d 382, 404 (Tex. App.—San Antonio 2013) ("[B]ecause front pay is a form of equitable relief, it is not limited by the statutory cap on compensatory damages."), *rev'd on other grounds*, 461 S.W.3d 131 (Tex. 2015); *Hoffman-La Roche, Inc. v. Zeltwanger*, 69 S.W.3d 634, 653 (Tex. App.—Corpus Christi 2002), *rev'd on other grounds*, 144 S.W.3d 438 (Tex. 2004); *see also City of Houston v. Levingston*, 221 S.W.3d 204, 234 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (relying on *Pollard* to hold that front pay was not subject to a statutory cap for "compensatory damages" under the Texas Whistleblower Act).

We agree with the conclusions reached in these cases and with the reasoning supporting the conclusions. We hold that the trial court's award of front pay was not subject to section 21.2585(d)'s cap and that the awards of front pay and future mental anguish, considered cumulatively, are not capped at $300,000. *See* Tex. Lab. Code Ann. § 21.2585(d)(4); *Nicholas*, 441 S.W.3d at 404. We overrule Bell Helicopter's sixth issue.

41

## Conclusion

Having overruled all of Bell Helicopter's six issues, we affirm the trial court's judgment.

/s/ Charles Bleil
CHARLES BLEIL
JUSTICE

PANEL: WALKER and PITTMAN, JJ.; CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

PITTMAN, J., filed a dissenting opinion.

DELIVERED: June 14, 2018