

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00131-CV

_____

IN THE INTEREST OF J.L., E.M., AND D.M., CHILDREN

On Appeal from County Court at Law No. 2
Wichita County, Texas
Trial Court No. 13296-JR-F

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant L.R. (Mother) appeals the trial court's termination of her parental rights to three[1] of her children, Luke, Jack, and Kyle,[2] on the ground that she failed to comply with a court-ordered service plan.[3] *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(O). In her first issue, she challenges the constitutionality of Section 161.001(d), which precludes termination based on the failure to comply with a court order if the parent proves by a preponderance of the evidence that (1) the parent was unable to comply with specific provisions of the court order and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent. *See id.* § 161.001(d). In Mother's second issue, she argues that the trial court abused its discretion by failing to grant her motion for

---

[1]Mother's fourth child, Mark, is the subject of a separate proceeding.

[2]We use aliases to refer to the children subjects of this appeal and their family. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

[3]This is our second time considering the termination of Mother's parental rights to Luke, Jack, and Kyle. In 2020, we reversed the trial court's first order terminating her rights because it had failed to provide a court reporter to record the proceedings as required by the Texas Family Code. *In re J.L.*, No. 02-20-00114-CV, 2020 WL 5242426, at *2 (Tex. App.—Fort Worth Sept. 3, 2020, no pet.) (mem. op.) (relying on Tex. Fam. Code Ann. § 201.009(a)).

2

new trial which urged the trial court to expressly consider the *Holley* factors in its determination of the children's best interests.

Because resolving Mother's constitutional argument is not necessary to this appeal, and because she has failed to show that the trial court abused its discretion by declining to grant a new trial, we affirm the trial court's order terminating Mother's parental rights.

## Background

### I. Circumstances Leading to Removal

Appellee, the Department of Family and Protective Services (the Department), became involved with Mother and the children in November 2018 when it received a report that Mother had been evicted from her apartment and had left her four children—the oldest of which, Luke, was seven years old at the time—with a neighbor. At trial, Mother claimed that she had left the children with the neighbor, who she did not realize was on parole and a diagnosed schizophrenic, for only one-and-a-half days. She testified that she left the children with the neighbor because she was trying to pack up her apartment.

The Department concluded that there was reason to believe Mother had committed neglectful supervision of the children and referred the case to family-based services; Mother was permitted to retain custody of all four children. At trial, Mother stated that she and the children had lived with her mother and a friend during that time, though she could not recall the friend's last name.

During this time, the Department became concerned about the children's apparent delayed development. Luke, diagnosed autistic, could not communicate. According to Mother, he also had attention-deficit disorder and attention-deficit/hyperactivity disorder. She also testified that Luke was not on medication for his autism at the time of removal because Mother did not "believe in taking medicines and stuff" but instead believed in taking "natural herbs" and eating certain foods that she claimed would "do the same things as the medicine." Jack's speech was also delayed and he was behind on his immunizations; and Kyle had medical issues related to lead poisoning.

## II. Removal and Implementation of Service Plan

Luke, Jack, Kyle, and Mark were removed from Mother's care in March 2019 based on the Department's conclusion of reason to believe she had committed neglectful supervision and on the Department's suspicions of Mother's drug abuse. As related to Luke, Jack, and Kyle,[4] Mother was placed on a court-ordered Family Service Plan by May 2019 that required Mother's

- maintaining sobriety;
- providing and maintaining a safe and stable home with working utilities;
- allowing Child Protective Services (CPS) and Court Appointed Special Advocates (CASA) to conduct announced and unannounced home visits;
- providing "names, dates of birth, driver's license numbers and social security numbers for anyone residing or found in the home";

---

[4]Mark was placed with his father, Cole.

4

- demonstrating a stable and legal source of income allowing her to provide for her children on an ongoing basis;
- providing a written budget monthly to her CPS caseworker, regardless of employment or income status;
- informing the Department of any change of address or phone number within three days of the change;
- complying with all CPS court orders;
- actively participating in and completing parenting classes, and providing a certificate of completion within ten days' completion;
- visiting with the children on a regularly scheduled basis;
- providing monthly in-kind child support (clothing, diapers, school supplies, etc.);
- understanding that any individual who Mother enters a relationship with must also complete the services identified in the service plan as necessary to the children's safety and well-being;
- being truthful, honest, and forthcoming in her dealings with the Department;
- reporting any relationship with someone who would have significant contact with her children within three days of such change occurring;
- completing a drug and alcohol assessment and following all resulting recommendations;
- submitting to random drug screens;
- providing valid prescriptions for any medications;
- completing a psychosocial evaluation and following all resulting recommendations;
- participating in individual counseling and following all resulting recommendations; and
- refraining from engagement in any criminal activity or associating with people engaging in illegal activity.

**A. Mother's Relationship with the Department**

Mother admitted at trial[5] that she participated in the development of the service plan and that she had signed the service plan, which included a provision acknowledging that she had received it and understood the requirements. Despite that, she also claimed

---

[5]The final trial was held over three days: January 21, March 5, and April 6, 2021.

at trial that she was unaware of or did not understand its requirements. She repeatedly blamed the Department, the trial court, or her lawyer,[6] claiming that they did not communicate with her or assist her in completing her services.

Testimony by caseworkers from the Department and CASA conflicted with Mother's claims of their refusal to help her. Lucas Olson, her Department caseworker from August 2019 through March 2020, testified that he went over the service plan with Mother at least three times and provided her a copy of it each time and any other time she requested one. He recalled that they met twice monthly to discuss her progress or lack thereof and that he communicated with her regularly through text messages and phone calls. He reported that Mother never expressed any doubt about what she had to do to earn back custody of her children.

Olson also described Mother's communications as displaying erratic behavior, explaining that she would send "very hostile messages . . . that were . . . accusing us of infringing on her rights, on her constitutional rights" and then act as if that never happened. He suspected that her up-and-down moods could be signs of drug use.

---

[6]Mother also claimed she did not remember many things, like whether she had appeared at certain hearings or whether her attorney had attended hearings. At one point, she could not recall her youngest child's birthday and blamed the Department, testifying, "I've been investigated by [the Department] numerous times, so it's hard to dictate the dates and times," and "the paperwork and stuff and remembering their dates, it's hard to remember." Initially she testified that Mark was born in 2019, but later agreed with the Department's counsel that Mark was born in 2016.

Beverly Vaughn, Mother's CASA caseworker, had a similar experience with Mother. She testified that she became "pretty close" with Mother and "worked closely with [Mother] in hopes to have a successful monitored return." She described Mother as being polite and sweet when she was getting her way, but "us[ing] some choice . . . words" when she was not getting her way. She communicated with Mother almost daily and encouraged Mother to stay on the right path; she described her communication with Mother as more than her average amount of communication with a parent in a Department case. Like Olson, Vaughn could not recall Mother ever reporting that she had not received the service plan.

Finally, Desiree Bernal testified to her experience working with Mother as her Department caseworker and point of contact since August 2020. Like Olson and Vaughn, Bernal communicated with Mother via phone calls and text messages.

## B. Transportation

One of Mother's primary excuses for failing to complete the service plan was her alleged lack of transportation. Mother claimed she could not make it to visitation sessions, counseling sessions, or drug tests, and that she could not find employment because either her car was in need of repair, she did not have a car, or her driver's license was expired. But the temporary orders in the case stated that the Department could supply transportation, including a bus pass; Olson and Vaughn described their offers and efforts to aid Mother with transportation, and Bernal testified that Mother never indicated she had transportation troubles.

Olson testified that he discussed transportation-assistance options with Mother "[s]everal times" and only requested she give him 48 hours' notice. Vaughn testified that she offered Mother transportation and only asked for a day's notice, and Mother only requested a ride from Vaughn twice. Vaughn testified, "Well, [Mother] always was needing a ride and then she [would] have a ride, and then the ride wouldn't come through. That was the story throughout." According to Vaughn, Mother refused to ride the bus.

During the trial, Mother stated that she had been walking everywhere but also stated that she had access to a rental car only for emergencies. She testified that she was late to the second day of trial because she had walked to the courthouse but walked back home to lock her front door. She denied refusing a bus pass, and she claimed that she did not know the Department could help with transportation, blaming the Department for not telling her they could help or for never responding.

**C. Employment and Housing**

At some point, Mother attended nursing school but "got distracted and had to drop out," in her words. Before her separation from Mark's father, Cole, he had been supporting her and the children. She testified that after their breakup, she supported herself and the children using Luke's survivor's benefits from his deceased father, which were around $700 a month, and that she also received help from her mother. In mid-2019, they lived in government-subsidized housing and she paid $179 in monthly rent, but they were evicted in November 2019 because, according to Mother, the property

8

manager was embezzling money from the government. She testified that she was no longer eligible for subsidized housing because of the eviction. She claimed that she failed to look for employment during that time because she was "overly protective" of her children, her mother was going through medical issues, and she could not find anyone to help her with the kids.

However, Mother also testified that she worked for a home-healthcare company[7] for six or seven months until the Covid-19 pandemic struck in March 2020 and she was let go. She received some unemployment benefits after that, and she acknowledged there was no reason she could not work by the time of trial. She worked a few odd jobs here and there—a couple of weeks at a Dress Barn, custodial work for a bondsman, and some furniture repair. Mother testified on the first day of trial that she had an interview with Pizza Hut scheduled after the hearing, but at the next day of trial, she testified that she did not make it to the interview due to a lack of transportation.

At some point after the children were removed in March 2019, Mother was homeless for two weeks. By the time of trial, Mother was leasing a home in Wichita Falls from a man she referred to as her uncle (though she later clarified they were not related) and who she was initially reluctant to identify by name. Her testimony regarding rent was inconsistent. Initially she testified that she paid $400 a month. Later she

---

[7]Later, she clarified that she worked for two different home-health companies, but she could not remember her dates of employment, and she was unsure of the name of one of the companies.

testified that she paid $750 a month and always had. Finally, she testified she had recently paid $500 a month and dismissed counsel's concerns by reporting that her "uncle" did not "scold [her] for not paying full rent." Bernal testified that Mother and her counsel had refused to allow the Department to visit the home.

### D. Mother's Abusive Relationships

Mother has a history of involvement in domestically violent relationships. She testified Luke's father was abusive during their five-year relationship. She also described her three-and-a-half or four-year relationship with Kyle's father, Ben, as being violent and accused Ben of being an alcoholic. She testified that his alcohol dependency caused "severe" problems that interfered with his ability to financially provide for them as a family and with his ability to take care of himself; she also claimed that she was afraid to leave her children in his care "[b]ecause he was always drinking" and he would lose his temper and drive drunk. She described an incident when he "got physical" with then-six-year-old Luke and "[she] defended [her] child." But according to Vaughn, Mother never expressed concerns about Ben being around the children until Ben was later arrested for assaulting a subsequent girlfriend, at which point Mother said to Vaughn, "See, he's not a good parent either. I want my children."

Ben, who testified at trial, described Mother as the aggressor in their relationship and testified that they drank and did cocaine together around twice a month during their relationship. He also alleged that Mother occasionally smoked marijuana. Once when they had been drinking and Ben was holding Jack, Mother struck Ben in the face,

10

accidentally striking Jack at the same time. Ben stated that he was "triggered" so, after he laid Jack down, they physically fought. Ben recalled calling the police once to report Mother's aggressive behavior, and Mother was arrested. Ben subsequently dropped the charges against Mother.

Mother also averred that Mark's father, Cole, became abusive about six months after Mark's birth, when she and the children lived in Oklahoma with Cole. She testified that "he started drinking heavily and he would get physical," "[w]ouldn't let [her] leave," "push[ed her]," and "a couple of incidents where he'd slapped [her] and pushed [her] up against the wall." Though she initially portrayed the abuse as more than one incident, she later claimed that she left after he hit her the first time and that the abuse occurred in one incident. At the time of the January trial date, Cole had custody of Mark, and Mother claimed that Cole would not allow her any visitation with Mark, despite the admission of temporary orders from their custody proceedings revealing that Mother was allowed supervised visitation of Mark.

In August 2020, Mother's acquaintance (whom she denied having a relationship with) was arrested for assaulting her. At trial, Mother could not recall any relationship she had in the three years prior to trial that did not involve alcohol or domestic violence. She also admitted that domestic violence and alcohol abuse are "[m]entally, physically, [and] emotionally" damaging to children. Her plan to protect her children from exposure to friends or partners with alcohol or drug issues or violent tendencies was to "[s]tay alone."

11

**E. Mother's Drug Problems**

Mother's testimony at trial was largely inconsistent with other evidence indicating that she had struggled with drug abuse over the years. At trial, she downplayed past marijuana use and outright denied using any other drugs: "I don't - - marijuana was something I experimented [with] but that was, you know - - I never done anything." She testified that she had "been around people who smoke meth" but denied using it. But the Department presented records from an October 2019 drug-assessment session in which Mother had indicated that she had a one-year history of methamphetamine use and had last used methamphetamine a week before the assessment. The same records indicated Mother had answered "Yes" to the following questions:

- Do you use a drug with a needle?
- During the past 12 months,
  - Have you used larger amounts of alcohol or drugs or used them for a longer time than you had intended?
  - Have you gotten so high or so sick from alcohol or drugs that it kept you from doing work, going to school, or caring for children?
  - Have you spent less time at work, school, or with friends so that you could drink or use drugs?
  - Has your use of alcohol or drugs caused emotional or psychological problems?
  - Has your use of alcohol or drugs caused problems with family, friends, work, or police?

The assessment also reflected a preliminary diagnosis of severe amphetamine-abuse disorder, Mother's inclusion in a "[p]riority [p]opulation" of injecting drug users, and a recommendation that she receive substance-abuse treatment. It summarized that Mother met the criteria for severe amphetamine abuse

12

as evidenced by [her] report of using larger amounts or using over a longer period of time than intended, persistent desire or unsuccessful efforts to cut down or control use, recurrent use resulting in a failure to fulfill major role obligations at work, school, or home, important social, occupational, or recreational activities are given up or reduce[d] because of use, recurrent use in situations where it is physically hazardous, continued use despite knowledge of having persistent/recurrent physical/psychological problems likely caused or exacerbated by use.

Mother claimed at trial that she did not remember the assessment, though she did acknowledge confessing during a family group conference to trying methamphetamines, cocaine, and marijuana in the past.

Mother's compliance with the Department's requests for drug tests was also inconsistent: she often blamed transportation issues or she claimed that the Department had failed to communicate necessary information about the drug tests. In January 2019 she tested positive for Adderall use, for which she claimed she had an "old prescription" but also admitted that it was expired.

Mother tested positive for methamphetamine and amphetamine usage in January, March, and September 2019 and January 2020; she tested positive for marijuana in April and September 2019 and January 2020. Mother blamed her positive methamphetamine test result on a roommate allegedly using methamphetamine. In June 2019, Mother was arrested and charged with methamphetamine possession, although she did not remember the arrest at trial until she was confronted with the arrest paperwork. She failed to complete any drug tests requested by the Department after March 2020.

13

Despite her denials of drug use, Mother attempted to attend three rehabilitation programs. Olson and Vaughn assisted Mother in two attempts to participate in inpatient rehabilitation in Dallas. Olson drove her to the Dallas facility and dropped her off, only to find out later that she had been turned away because she had failed to disclose pertinent medical information relating to a preexisting condition. Mother subsequently completed only four days of inpatient rehabilitation at an Oklahoma facility before leaving against medical advice. Vaughn and Olson then arranged for Mother to return to the Dallas facility in March 2020, with Vaughn making arrangements to drive Mother to the facility. But when Vaughn arrived to pick Mother up, Mother's home was vacant, and Mother refused to answer her phone. When Mother finally returned Vaughn's calls later that day, Mother revealed she had moved her things into storage and was staying with a friend, and Mother blamed Vaughn and Mother's attorney, cursing and accusing them of "setting her up to fail" and asserting that it was not her fault her phone did not ring.

Mother claimed at trial that she successfully completed a drug-rehabilitation program somewhere in North Carolina;[8] however, she could not recall the name of the

---

[8]Mother testified that her "uncle" paid for the North Carolina program, but initially claimed she did not remember his name and then asked to "plead the Fifth" to avoid giving his name. She finally gave his name and then admitted that they are not biologically related but he "helped take care of [her]." She testified that she could not call him and ask how much the rehabilitation program cost or what the name of it was because he was "trying [not] to be involved."

facility, where it was located, or when exactly she attended it.[9] When asked for paperwork supporting her claim, she first blamed the Department for not giving her a copy of it; she blamed Covid-19 for her failure to secure a copy of it directly from the North Carolina facility; and she finally claimed that the paperwork was at her home and she would have to find it. Olson acknowledged that Mother provided a completion certificate but testified that it was fake.

### F. Visitation, Counseling, and Parenting Classes

Mother's attendance at visitation sessions with her children was somewhat sporadic and she only attended about half of the scheduled visitation sessions. When she did attend, she arrived late so often that the Department eventually required her to arrive one hour before the scheduled visitation time. Eventually she stopped attending and, by the first day of trial in January 2021, she had not seen the children in at least ten months. She admitted that she had not sought any visitation, but she averred that she had asked for information about the children "[p]lenty" of times.

Similarly, Mother was discharged from counseling because of her failure to attend scheduled sessions. She did not reestablish counseling with anyone else thereafter.

---

[9]Similarly, Mother reported that she had completed eleven of the Alcoholics Anonymous' program steps, but she could not remember what the eleventh step entails or what the first step was.

Mother claimed to have completed an online parenting class without realizing that the service plan required it to be with specific providers. She provided a certificate of completion to Olson; he determined that the certificate was fake. Mother admitted at trial that she did not complete any domestic-violence-education classes.

**G. The Department's Overall Concerns**

Vaughn testified that she had continuing concerns that Mother "was never consistent, as she always tried to find ways to go around what she needed to do." As she put it, "[I]t was always an excuse why she couldn't complete a service." It also concerned Vaughn that Mother "d[id not] see any fault in anything pertaining to this case and she becomes very emotional when you do entrap her in situations. . . . [W]hich it's not really healthy. Even around the children she gets very emotional and she begins to blame situations on others instead of . . . taking responsibility [for] the situation herself." Mother's testimony at trial only confirmed Vaughn's conclusion that termination was in the best interest of the children because, she testified,

> it appears that she is still fabricating a lot of things, like she started to do after the second time of her not going to rehab. Her stories change consistently and then she didn't remember telling you what she had originally stated. That kind of confirmed more of her ability to not change.
>
> And if the children are placed back with her, it will be back into the same environment, the inconsistency of her doing what she needs to do for the children.

Olson expressed similar concerns and his conclusions that Mother had failed to comply with the service plan.

## H. Future Plans for the Children

At the time of trial, Luke was living with his maternal grandmother, and Jack and Kyle were living with a relative. Luke was receiving speech, occupational, and physical therapy at his school. He required special care as a result of his autism, and Vaughn doubted Mother could adequately care for Luke and his special needs because she could not take care of her own. Bernal testified that Jack received speech therapy to assist with his development.

When questioned regarding her plans for the children's care if she were to be convicted of felony drug possession and face jail time, Mother said she "would have things situated" and "would make a plan" with the Maternal Grandmother at Mother's home and Mother would pay the bills. When asked how she could pay the bills if she were incarcerated, Mother replied, "If there's a will, there's a way." She accused the Department of being the real problem because "instead of helping me, knowing my situation, they just threw me out and forgot about me."

## III. The Trial Court's Decision, Findings, and Conclusions

The trial court determined that termination of Mother's parental rights to Luke, Jack, and Kyle was in their best interest and justified because Mother had failed to comply with the provisions of the court-ordered service plan. Key findings included that much of Mother's testimony lacked credibility, including her claims to have completed a parenting class and an inpatient rehabilitation program and her denial of any history of drug abuse or criminal charges pending against her. It also found her

testimony "about lack of transportation . . . muddled and confusing at best and lacking in credibility at worst." It found Vaughn's, Olson's, Ben's, and Bernal's testimonies to be credible. The trial court also found that Mother failed to prove by a preponderance of the evidence that she was unable to comply with specific provisions of the court order, she had made a good-faith effort to do so, and her failure was not attributed to any fault of hers.

## Discussion

Mother presents two issues on appeal: first, she argues that section 161.001(d) is unconstitutional on its face and as applied to her; second, she argues that the trial court abused its discretion by refusing to grant her motion for a new trial expressly considering the *Holley* factors in its best-interest determination. It is unnecessary to reach Mother's constitutional arguments in resolving her appeal, and she has not shown the trial court abused its discretion by declining to grant a new trial. Accordingly, we overrule both of her issues and affirm the trial court's judgment.

## I. Standard of Review and Law Applicable to Termination Cases

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1) and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

18

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *J.F.C.*, 96 S.W.3d at 263; *see also E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder— the trial court in this case—is the sole judge of the witnesses' credibility and demeanor.

*In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We assume that the trial court settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother failed to comply with the terms of the service plan or that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## II. Constitutional Challenge to Section 161.001(d)

In her first issue, Mother argues that Section 161.001(d) violates the constitution by impermissibly shifting the burden of proof to her and away from the Department.

*See Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403 (holding that, at a minimum, states must meet a clear-and-convincing burden of proof to satisfy due process in parental-rights-termination cases); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980) (holding similarly).

Section 161.001(b)(1)(O) allows for termination of parental rights if the court finds by clear and convincing evidence that the parent failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the Department's care for at least nine months as the result of the child's removal from the parent. Tex. Fam. Code Ann. § 161.001(b)(1)(O). Section 161.001(d) then provides:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> (1) the parent was unable to comply with specific provisions of the court order; and
>
> (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Tex. Fam. Code Ann. § 161.001(d).

Mother argues that, on its face and as applied to her, this subsection impermissibly shifts the burden of proof to the parent facing termination. In support of her argument, she relies heavily on the fractured Supreme Court opinion in *In re L.M.I.*, and cases succeeding it, which related to voluntary affidavits of relinquishment of parental rights. 119 S.W.3d 707 (Tex. 2003); *see also, e.g., In re D.E.H.*, 301 S.W.3d

21

825 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g); *In re R.B.*, 225 S.W.3d 798 (Tex. App.—Fort Worth 2007, no pet.).

But Mother's reliance on *L.M.I.* is misplaced, and her constitutional argument is of no avail. Mother is correct that Justice Dale Wainwright, in a concurring opinion in *L.M.I.*, expressed his concerns about burden-shifting in the context of termination cases. 119 S.W.3d 715–16 (Wainwright, J., concurring). However, Mother ignores the fact that Justice Wainwright also concluded that the issue of whether the burden impermissibly shifted was not necessary to the resolution of the case because, either way, the mother's appeal was unsuccessful. *Id.* at 715–16, 729–30 (agreeing with Justice Priscilla Owen's concurring opinion that posited a reasonable factfinder could have formed a firm belief that the mother voluntarily executed the relinquishment affidavit). The same is true in this case.

We presume that a statute enacted by our Legislature is constitutional. *In re Doe 2*, 19 S.W.3d 278, 284 (Tex. 2000). Relatedly, we are to consider a statute's constitutionality only when the question is properly raised and when such determination is necessary and appropriate to a decision in the case. *Id.*; *see also Tex. Ass'n of Bus. v. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) ("[W]e have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department."). Similar to Justice Wainwright's viewpoint in his *L.M.I.* concurrence, we conclude that the issue of whether Section 161.001(d) impermissibly shifts the burden away from the party

22

seeking termination is not necessary to the resolution of Mother's appeal; the result is the same regardless of how we resolve the question.

Mother's request for relief is not that we reverse the trial court's judgment, but instead she requests that we

> reform Texas Family Code § 161.001(d) to require the *Department* to prove that a parent was *able* to comply with a specific court order and require the *Department* to prove that the parent did *not* make a good faith effort to comply with the order, by a constitutionally-mandated clear and convincing evidence standard.

[Emphasis added.] She provides no authority, nor are we aware of any, that would empower us to do what she asks. We do not have the authority to freely rewrite legislation. *C.f. Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009) ("Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that lawmakers chose . . . ."). But even if we were to do so, it would not change the result in this case.

The evidence is legally and factually sufficient to support the trial court's findings that (1) she failed to comply with the court-ordered service plan, and (2) her failure to comply was not the result of her inability to comply with specific provisions, despite her good-faith effort to comply, or unattributable to any fault of her own. This is true even if the Department had been required to prove the latter by clear and convincing

evidence.[10] *C.f. R.B.*, 225 S.W.3d at 805–06 (holding clear and convincing evidence supported voluntariness of relinquishment affidavit, thereby obviating need to address constitutional issue regarding burden shifting).

The trial court was presented with evidence that rather than accepting responsibility for failing to comply with the service plan, Mother made excuses for her behavior: her testing positive for methamphetamine use was her roommate's fault and her failure to complete tasks including parenting classes, rehabilitation programs, requested drug screenings, counseling, steady employment, and visitation sessions were the Department's fault or chronically vague transportation issues. It heard Vaughn's, Olson's, and Bernal's testimony about their efforts to help Mother: extensive communication and availability through text messaging and phone calls, even after hours; offers of bus passes; offers to drive her to appointments; arrangements for her to attend a rehabilitation program twice; multiple discussions of the service plan's requirements and supplying her copies of the service plan on request. It heard Olson's testimony that the certificates of completion Mother offered for a parenting class and a rehabilitation program were fake. And it heard testimony and received evidence of Mother's positive drug tests, missed drug tests, and her arrest for and charge of methamphetamine possession. It also heard evidence of the children's improvements

---

[10]To be clear, we do not hold that the Department is required to do so in parental-rights termination cases.

after removal and Luke's significant ongoing needs, juxtaposed with Mother's lack of plans for caring for the children if they were returned to her care and her ten-month absence from their lives after failing to request visitation. Based on the record before us, we hold that the trial court could have reasonably formed a firm conviction or belief that the Department met its burden to show grounds for termination and that Mother's failure to comply with the service plan was inexcusable.

Accordingly, it is not necessary for us to reach Mother's constitutional challenge. *See* Tex. R. App. P. 47.1. We therefore overrule her first issue.

## III. Motion for New Trial and *Holley* Factors

In her second issue, Mother argues that the trial court erred by refusing to grant Mother's motion for a new trial, which urged the trial court to take the *Holley* factors into consideration in making its ruling. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Mother hangs her argument on a footnote in the trial court's letter ruling stating that it considered "all of the factors set out in Tex. Fam. Code § 263.307" in making its determination that termination was in the children's best interest.

We review a trial court's decision denying a motion for new trial under an abuse of discretion standard. *D.E.H.*, 301 S.W.3d at 830. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Mother has not shown that the trial court abused its discretion by denying her motion for new trial. In *Holley*, the Supreme Court provided a list of nonexclusive factors that the factfinder may apply in determining the child's best interest. It did not *require* every factor be applied in every case, and as many courts have observed, the list of factors is not exhaustive—some listed factors may be inapplicable to some cases, while other factors not on the list may also be considered when appropriate. *See, e.g.*, *In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, pet. denied).

Moreover, the trial court's footnote did not state that the trial court did not consider the *Holley* factors in making its best-interest determination; it merely stated that it considered the Section 263.307 factors, which Mother does not contest are appropriate considerations in a termination case. *See* Tex. Fam. Code Ann. § 263.307.[11] Additionally, a letter ruling is not competent evidence of the trial court's basis for a finding of the children's best interest. *Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 911 n.7 (Tex. App.—Fort Worth 2018, pet. denied). Finally, Mother does not challenge the sufficiency of the evidence supporting the trial court's best-interest determination. We are bound to affirm the trial court's judgment if it is correct on any

---

[11]Section 263.307 lists factors that "should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment" and in light of the presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." *Id.*

legal theory supported by the evidence,[12] and Mother has not shown (or even attempted to show) that termination would not be in the children's best interest if the evidence were expressly considered in light of the *Holley* factors.

We therefore overrule Mother's second issue.

## Conclusion

Having overruled both of Mother's issues on appeal, we affirm the trial court's order terminating her parental rights.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  October 7, 2021

---

[12]*Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679 (Tex. App.—Fort Worth 2015, no pet.).